**GLANCY PRONGAY & MURRAY LLP**
Brian P. Murray (*pro hac vice application pending*)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone:      (212) 682-5340
Facsimile:      (212) 884-0988
Email: bmurray@glancylaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman (*pro hac vice*)
Murielle J. Steven Walsh (*pro hac vice*)
Aatif Iqbal (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:      (212) 661-1100
Facsimile:      (212) 661-8665
Email:    mjsteven@pomlaw.com
              aiqbal@pomlaw.com

*Lead Counsel for Plaintiffs*

[*Additional counsel on signature page*]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN H. ROBB, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>FITBIT INC., JAMES PARK, WILLIAM R. ZERELLA, ERIC N. FRIEDMAN, JONATHAN D. CALLAGHAN, STEVEN MURRAY, CHRISTOPHER PAISLEY, MORGAN STANLEY & CO. LLC, DEUTSCHE BANK SECURITIES INC., and MERRILL LYNCH, PIERCE, FENNER & SMITH INC.<br><br>Defendants. | No. 3:16-cv-00151-SI<br><br>CLASS ACTION<br><br>**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>Judge:        Hon. Susan Illston<br>Courtroom:  1 – 17th Floor<br><br>DEMAND FOR JURY TRIAL |

{00207031;18 }

AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:16-CV-00151-SI

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

{00207031;18 }

AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:16-CV-00151-SI

# I. INTRODUCTION

1.      Lead Plaintiff Fitbit Investor Group (consisting of Plaintiffs Timothy Flynn, Jesse M. Koth and Kelley Koth, Viet Tran, and Mark Cunningham), on behalf of itself and all others similarly situated, alleges the following based on the investigation of Lead Counsel, which included a review of SEC filings by Defendant Fitbit Inc. ("Fitbit" or the "Company") as well as regulatory filings and reports, securities analysts' reports and advisories, press releases and other public statements issued by the Company, media reports about the Company, and interviews with several confidential witnesses. Lead Plaintiff believes that substantial additional evidentiary support will exist for these allegations after a reasonable opportunity for discovery.

# II. SUMMARY OF THE ACTION

2.      This is a consolidated federal securities class action that separately sets forth claims under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 et seq., and under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 et seq.

3.      Lead Plaintiff asserts the Exchange Act Claims on behalf of a Class of all persons who purchased or otherwise acquired Fitbit securities on the open market between June 18, 2015 and May 19, 2016, both dates inclusive (the "Exchange Act Class Period"). As to the Exchange Act Claims, Lead Plaintiff separately alleges that Exchange Act Defendants acted knowingly or were deliberately reckless in issuing materially false or misleading statements and/or failing to disclose material facts concerning the inaccuracy of the Company's heart-rate tracking devices during the Exchange Act Class Period and are thus liable for violations of Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), respectively.

4.      Lead Plaintiff asserts the Securities Act Claims on behalf of a Class of all persons who purchased or otherwise acquired Fitbit Class A common stock pursuant and/or traceable to the Company's initial public offering on or about June 18, 2015 (the "IPO"). The negligence and strict liability-based Securities Act Claims are pled separate and apart from the Exchange Act Claims. Plaintiffs allege that Securities Act Defendants are strictly liable for issuing materially false or misleading statements and/or failing to disclose material facts concerning the inaccuracy of the Company's heart-rate tracking

{00207031;18 }

devices, in violation of Sections 11 and 15 of the Securities Act, 15 U.S.C. §§ 77k and 77o. The Securities Act Claims do not incorporate by reference, or otherwise rely upon, any allegations pled in support of the Exchange Act Claims, except those non-fraud based allegations that are specifically incorporated. Lead Plaintiff's non-fraud allegations in support of the Securities Act Claims are pled as separate, stand-alone claims under the notice-pleading standards of Federal Rule of Civil Procedure 8(a).

### III. PRELIMINARY STATEMENT

5.      Founded in 2007, Fitbit manufactures and provides wearable fitness-tracking devices worldwide. Its products purport to monitor a user's fitness level by tracking daily activity statistics, such as steps taken, distance traveled, calories burned, stairs climbed, and time spent in sleep.

6.      Before October 2014, Fitbit's devices calculated these activity statistics solely from data from sensors that detected only simple movements, such as accelerometers and altimeters.

7.      In October 2014, Fitbit announced its new "proprietary PurePulse™ optical heart-rate technology," which purported to "provide[] continuous and automatic wrist-based heart rate tracking, without an uncomfortable chest strap."

8.      Heart-rate data can be extremely useful. According to Fitbit's website, athletes can use such real-time heart-rate data to "[c]heck heart rate at a glance to gauge your effort and adjust workouts on the spot" and "[s]et a target heart rate zone to ensure you're pushing yourself hard enough, but not overtraining." Moreover, a device with heart-rate data can calculate calorie burn much more precisely than a device relying solely on accelerometers and altimeters.

9.      Fitbit's revenues grew rapidly in 2015, fueled primarily by sales of its new products featuring PurePulse technology.

10.     On or about June 18, 2015, Fitbit completed its IPO, raising approximately $416 million.

11.     However, leading up to the IPO, in the IPO, and for months afterward, the Defendants made materially false and/or misleading statements concerning the accuracy of the Company's proprietary PurePulse heart-rate monitoring technology. Specifically, they falsely claimed that Fitbit's devices could provide consistently accurate heart-rate readings during exercise, including through repeated claims

{00207031;18 }

AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:16-CV-00151-SI

4

in product advertising and in statements to investors that "Every Beat Counts" and that the devices allowed users to "Know Your Heart." And to investors, Defendants portrayed Fitbit's proprietary heart-rate monitoring technology as a major competitive advantage for the Company, particularly with respect to Fitbit's ability to market its products to athletes seeking to maximize their performance.

12.     However, contrary to the Defendants' representations, Fitbit's PurePulse heart-rate monitoring technology was highly inaccurate. Importantly, Fitbit had expressly marketed its devices with heart-rate monitoring for activity and fitness, including by advertising their use during high-intensity workouts, including pushups, jump-rope, cycling, and dancing. But in fact, during these activities, Fitbit's devices were so inaccurate about users' heart rates as to be useless at best, and even potentially dangerous to any user who relied on a Fitbit device to "Set a target heart rate zone to ensure you're pushing yourself hard enough, but not overtraining," as Fitbit advertises.[1]

13.     Over the course of January 5, 2016 to May 19, 2016, the truth about the inaccuracy of Fitbit's heart-rate tracking devices was revealed in a lawsuit, subsequent reporting, and finally a comprehensive study of Fitbit devices' heart-rate tracking accuracy. Fitbit's stock price fell from a high of $30.96 on January 5 to close at $13.99 on May 19. This represents an overall loss of 54.8% of the value of Fitbit's stock.

14.     As a result of Defendants' false and/or misleading statements, Fitbit securities were offered and traded at inflated prices. After the disclosure of information correcting Defendants' false and/or misleading statements, Fitbit's stock suffered a precipitous decline losing 54.8% of its market value, thereby causing significant losses and damages to Lead Plaintiff and other members of the Securities Act Class and the Exchange Act Class.

### IV. JURISDICTION AND VENUE

15.     The claims asserted herein arise under Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k, 77o), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5).

---

[1] Fitbit PurePulse, https://www.fitbit.com/purepulse (last visited June 30, 2016).

{00207031;18 }

16.     This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

17.     Venue is proper in this District under Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b), as Fitbit maintains its principal executive offices in this District.

18.     In connection with the acts, conduct and other wrongs alleged herein, Defendants either directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## V. PARTIES

### A.     **Plaintiffs**

19.     The Fitbit Investor Group (consisting of Plaintiffs Timothy Flynn, Jesse M. Koth and Kelley Koth, Viet Tran, and Mark Cunningham) was appointed Lead Plaintiff on May 10, 2016.

### B.     **Defendants**

20.     Defendant Fitbit is a Delaware corporation with principal executive offices at 405 Howard Street, Suite 550, San Francisco, California 94105. Founded in March 2007 under the name Healthy Metrics Research, Inc., it changed its name to Fitbit, Inc. in October 2007. Its stock trades on the NYSE under the ticker symbol "FIT."

21.     Defendant James Park has served at all relevant times as Chief Executive Officer, Chairman, and President of Fitbit. For the Company's fiscal year 2014, Defendant Park received $7,844,625 in total compensation, including salary, bonus, option awards, and all other compensation. Defendant Park signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

22.     Defendant William R. Zerella has served at all relevant times as Chief Financial Officer of Fitbit. For the Company's fiscal year 2014, Defendant Zerella received $4,991,089 in total compensation, including salary, bonus, option awards, and all other compensation. Defendant Zerella signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

{00207031;18 }

23.     Defendant Eric N. Friedman has served at all relevant times as Chief Technology Officer and Director of Fitbit. For the Company's fiscal year 2014, Defendant Friedman received $7,847,795 in total compensation, including salary, bonus, option awards, and all other compensation. Defendant Friedman signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

24.     Defendant Jonathan D. Callaghan has served at all relevant times as Director of Fitbit. Defendant Callaghan signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

25.     Defendant Steven Murray has served at all relevant times as Director of Fitbit. Defendant Murray signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

26.     Defendant Christopher Paisley has served at all relevant times as Director of Fitbit. Defendant Paisley signed the false and misleading IPO Registration Statement and Secondary Offering Registration Statement.

27.     Together, Park, Zerella, Friedman, Callaghan, Murray, and Paisley are the "Individual Defendants."

28.     Together, Fitbit, Park, Zerella, and Friedman are the "Exchange Act Defendants."

29.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") provides a variety of financial services to clients including corporations, governments and financial institutions. Morgan Stanley's principal office is located at 1585 Broadway, New York, N.Y. 10036. Morgan Stanley acted as an underwriter in connection with the IPO.

30.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a registered securities broker-dealer and investment advisor. The principal office of Deutsche Bank is located at 60 Wall Street, New York, N.Y. 10005. Deutsche Bank acted as an underwriter in connection with the IPO.

31.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. ("Merrill Lynch") acts as a broker for corporate, government, and institutional clients and as a dealer in the purchase and sale of various

{00207031;18 }

financial instruments. The principal office of Merrill Lynch is located at One Bryant Park, New York, N.Y. 10036. Merrill Lynch acted as an underwriter in connection with the IPO.

32.    Together, Morgan Stanley, Deutsche Bank, and Merrill Lynch are the "Underwriter Defendants."

33.    Together, Fitbit, the Individual Defendants, and the Underwriter Defendants are the "Securities Act Defendants."

## VI. COMMON FACTUAL ALLEGATIONS

### A.    Fitbit and the IPO

34.    Founded in 2007, Fitbit manufactures and provides wearable fitness-tracking devices. Its products purport to monitor a user's fitness level by tracking daily activity statistics, such as steps taken, distance traveled, calories burned, stairs climbed, and sleep duration and quality.

35.    Fitbit has grown rapidly since its founding, generating $14.5 million in revenue in 2011, $76.4 million in 2012, $271.1 million in 2013, $745.4 million in 2014, and $1.858 billion in 2015.

36.    On May 7, 2015, Fitbit filed a registration statement on Form S-1 in connection with the IPO.  The registration statement was subsequently amended several times, with the final amended registration statement filed on Form S-1/A on June 16, 2015 (collectively, the "IPO Registration Statement"). On June 17, 2015, the SEC declared the IPO Registration Statement effective.

37.    The IPO Registration Statement contained a preliminary prospectus.  The final prospectus (the "IPO Prospectus") was filed on June 18, 2015.

38.    The Underwriter Defendants acted as underwriters in connection with the IPO. The Underwriter Defendants provided financial advice to Fitbit and assisted in the preparation and dissemination of Fitbit's IPO materials. Underwriter Defendants marketed and solicited support for the IPO.

39.    On or about June 18, 2015, the Company completed its IPO. The Company sold 22,387,500 shares and certain other selling stockholders (including Defendants Park, Friedman, Callaghan, and Murray) collectively sold 19,673,750 shares. The Company raised net proceeds of approximately $416 million.

{00207031;18 }

40. On November 2, 2015, Fitbit filed a registration statement on Form S-1 in connection with its secondary public offering (the "Secondary Offering"). The registration statement was subsequently amended, with the final amended registration statement filed on Form S-1/A on November 9, 2015 (collectively, the "Secondary Offering Registration Statement"). On November 12, 2015, the SEC declared the Secondary Offering Registration Statement effective.

41. The Secondary Offering Registration Statement contained a preliminary prospectus. The final prospectus (the "Secondary Offering Prospectus") was filed on November 13, 2015.

42. On or about November 13, 2015, the Company completed its Secondary Offering. The Company sold 3,000,000 shares and certain other selling stockholders (including Defendants Park, Zerella, Friedman, Callaghan, and Murray) collectively sold 14,000,000 shares. The Company raised net proceeds of approximately $82.7 million.

43. As of December 31, 2015, Fitbit had 1,101 employees.

**B.    Fitbit's PurePulse Technology**

44. Before October 2014, Fitbit's activity trackers were essentially pedometers aimed at "everyday" users. Such products included:

a.    The Fitbit Zip, an "entry-level wireless activity tracker that allows users to track the most important daily activity statistics such as steps, distance, calories burned, and active minutes," for $59.95;

b.    The Fitbit Flex, a "wristband-style tracker, with a sleek and stylish design, that tracks steps, distance, calories burned, active minutes, and sleep," for $99.95; and

c.    The Fitbit One, "a more advanced clippable wireless tracker that tracks stairs climbed and sleep in addition to daily steps, distance, calories burned, and active minutes," for $99.95.

45. The Zip and Flex calculate a user's daily activity statistics from data provided by a single sensor: a 3-axis accelerometer, which measures acceleration. The "more advanced" Fitbit One uses two sensors: the accelerometer and an altimeter.

46. In an October 27, 2014 press release, Fitbit announced a new feature: its new "proprietary PurePulse™ optical heart-rate technology," which purported to "provide[] continuous and automatic

{00207031;18 }

wrist-based heart rate tracking, without an uncomfortable chest strap."[2] PurePulse uses pulses of green light to detect blood flow in capillaries in the user's skin, from which "finely tuned algorithms" calculate the user's purported heart rate.

47.     Fitbit repeatedly represented that PurePulse was the result of extensive research and development.

48.     In a March 27, 2015 article in the Washington Post, Defendant Park stated that PurePulse "was the result of three years of R&D effort."[3]

49.     In a conference call with Fitbit investors and stock market analysts on August 5, 2015, Defendant Park stated "the PurePulse technology in Charge HR and Surge took many, many years to develop and perfect. The key thing for us is we will only launch products when we feel that they're ready."[4]

50.     Fitbit's October 2014 press release stated that "Fitbit consults with scientific experts and also tests its products with independent labs to ensure they meet stringent standards. This year Fitbit also created the first-ever Scientific Advisory Board for wearables that includes leading, certified dermatologists to help enhance Fitbit's testing protocols and develop product wear and care guidelines."

51.     The IPO Prospectus described Fitbit's competitive advantages as its "leading market position and global brand," its "advanced and proprietary sensor technologies," and its "singular focus on health and fitness, which has driven us to dedicate significant resources to developing proprietary sensors, algorithms, and software to ensure that our products, which are specifically oriented towards health and

---

[2] Press Release, Fitbit, Inc., Fitbit Announces Fitbit Charge, Fitbit Charge HR and Fitbit Surge (Oct. 27, 2014) available at https://investor.fitbit.com/press/press-releases/.

[3] Matt McFarland, *Fitbit's CEO discusses the looming Apple Watch, and how having friends with Fitbits makes you healthier*, Washington Post (Mar. 27, 2015) https://www.washingtonpost.com/news/innovations/wp/2015/03/27/fitbits-ceo-discusses-the-looming-apple-watch-and-how-having-friends-with-fitbits-makes-you-healthier/.

[4] Thopmson Reuters StreetEvents, *Edited Transcript of FIT earnings conference call or presentation 5-Aug-15 9:00pm GMT*, Yahoo! Finance (Aug. 6, 2015 2:38 AM), http://finance.yahoo.com/news/edited-transcript-fit-earnings-conference-063828001.html.

{00207031;18 }

fitness, have accurate measurements, insightful analytics, compact sizes, durability, and long battery lives."[5]

### C.    **Fitbit's PurePulse Devices**

52.    Fitbit's October 2014 press release announced two new products featuring PurePulse technology:

> a.    Fitbit Charge HR, "a wireless heart rate and activity wristband" that "tracks steps, distance, calories burned, active minutes, floors climbed, and sleep" and "also includes our proprietary PurePulse heart rate tracking technology," for $149.95; and
>
> b.    Fitbit Surge, a "fitness 'super watch'" that combines popular features of a GPS watch, heart rate tracker, activity tracker, and smartwatch," for $249.95.

53.    Fitbit actively marketed the Charge HR and Surge specifically towards athletes and more active users, who are often willing to pay higher prices.

54.    Fitbit's website currently labels the Zip, One, Flex, and Charge as marketed towards "everyday" users, whereas the Charge HR is for "active" users and the Surge is for "performance" users.[5]

55.    Fitbit's October 2014 press release described the Charge HR as "designed for more active users who are dedicated to staying fit and want a full picture of their health—in and out of the gym."

56.    The IPO Prospectus describes "active users" as follows:

> Active users exercise regularly to reach their fitness goals through activities such as running, using cardio equipment, and playing sports recreationally. As a result, these users are often interested in ***monitoring exercise intensity*** through heart rate tracking in addition to activity tracking. We primarily market the Fitbit Charge HR to Active users.

57.    Fitbit's October 2014 press release described the Surge as "designed for peak performance" and "ideal for users committed to training, dedicated to health and consistently looking to maximize progress."

---

[5] *See* Fitbit Official Site, http://www.fitbit.com/home (hover over "Products" heading for list of products sorted by type of user) (last visited June 30, 2016).

{00207031;18 }

58.     The IPO Prospectus describes "performance users" as follows:

> Performance users train regularly to improve their performance and achieve their personal bests. These users participate in ***endurance sports and fitness activities with higher intensity*** and longer duration, such as interval or distance running and cycling, and thrive on personal improvement and competition. Accordingly, these users are interested in GPS tracking of speed, distance, and exercise routes, in addition to heart rate and daily activity tracking. We primarily market the Fitbit Surge to Performance users.

59.     As market commentators noted, PurePulse was an essential part of Fitbit's appeal among these users. An article in PC World stated that, precisely because of the new heart-rate monitoring technology, "Fitbit is aiming [the Charge HR] at regular exercisers who might want to set target heart rates during workouts, get more accurate calorie burn estimates, and see details on resting heart rate and heart rate trends."[6]

60.     Thus, Fitbit's advertising for the Charge HR and Surge focused heavily on their heart-rate monitoring features, with slogans including "Get More Benefits with Every Beat" and "Every Beat Counts."

### D.    Heart-Rate Monitoring, Generally

61.     Heart-rate data can be extremely useful. Resting heart rate is among the most useful metrics of overall cardiovascular health. Moreover, devices with heart-rate data can calculate calorie burn and other daily activity statistics much more accurately than devices relying solely on accelerometers and altimeters, such as Fitbit's earlier devices.

62.     Real-time heart-rate data is particularly useful for athletes seeking to optimize their workouts. Athletic workouts often target particular heart rates, and real-time heart-rate data can help exercisers maintain a heart rate that is high enough to provide a good workout, but not so high as to threaten their cardiovascular health.

---

[6] Jared Newman, *Fitbit gets fancier with Charge activity trackers, fitness-focused Surge 'super watch'*, PCWorld (Oct. 27, 2014 6:10 AM), http://www.pcworld.com/article/2838937/fitbit-gets-fancier-with-charge-fitness-trackers-surge-super-watch.html.

{00207031;18 }

63.    Fitbit's October 2014 press release described some of these benefits as follows:

"Whether your goal is to become more active, improve your heart health or lose weight, ***tracking everyday activity and heart rate is essential***," said Harley Pasternak, best-selling fitness and nutrition author, personal trainer and Fitbit brand ambassador. "***Heart rate tracking is the most accurate way to measure calorie burn, helping you maximize workouts while still properly fueling your body***. With Fitbit's new heart rate feature, users have access to more information than ever before, making it even easier to access the information needed to track, reach and beat goals."

64.    Similarly, in a February 12, 2015 post on Fitbit's blog, "Fitbit ambassador and ultramara-thon man Dean Karnazes" described "how he uses the heart rate tracking in his Fitbit Surge while training for his races":

Having a heart rate monitor is an invaluable tool for maximizing your training and quantifying aerobic improvements that occur as a result. Without having such measurements you don't know whether you're improving or not and can't train as efficiently.

When I'm training, I monitor my heart rate to stay within certain parameters during certain stages of the run. Mostly I try to stay within the target range to help conserve energy and avoid building up too much lactic acid. But during interval training I push toward the upper ranges for set intervals of time during speed bursts.

To make the most out of your ChargeHR or Surge, wear it 24/7 to get used to watching fluctuations in your heartbeat and correlating those with the way you feel. This will give you a more innate understanding of how your body works throughout the course of the day.[7]

65.    However, many of these benefits are only available if the underlying heart-rate monitoring is fairly accurate—and reliably so. At the very least, the heart-rate monitor must be able to tell when the athlete's heart rate is in the target range and when it is reaching the athlete's upper limits.

---

[7] Fitbit Staff, How Dean Karnazes Uses Heart Rate Data While Training (Feb. 12, 2015) https://blog.fitbit.com/how-dean-karnazes-uses-heart-rate-data-while-training/.

{00207031;18 }

66.     Heart-rate data must be especially accurate if it is to be used for athletes seeking to opti-mize the intensity of their workouts by ensuring that their heart rate remains within a precise range for particular intervals during a workout.

67.     For example, Fitbit's website currently markets its PurePulse products as enabling users to:

    a.  "Accurately track calorie burn all day and during exercise to stay in control of your weight,"

    b.  "Check real-time heart rate to ensure you're giving the right amount of intensity during workouts,"

    c.  "Use simplified heart rate zones to tailor your workouts on the spot and make the most of training time," and

    d.  "See when your health is improving by analyzing your all-day and resting heart rate trends."[8]

68.     For a heart-rate monitoring device to provide these advertised benefits, the underlying heart-rate data must be accurate and precise enough to determine which heart rate zone the user is in and whether the user is "giving the right amount of intensity during workouts."

**E.    Fitbit's Sales Growth**

69.     The Charge HR and Surge sold very quickly, driving Fitbit's revenues to grow rapidly in 2015.

70.     As the IPO Prospectus noted, the Charge, Charge HR, and Surge were "the primary drivers of our revenue growth in the first quarter of 2015," in large part because the Surge was the "highest selling GPS fitness watch in the United States in the first quarter of 2015, with a 61% share of the U.S. GPS fitness watch market, by dollars, up from 3% in 2014."

71.     On Fitbit's August 5, 2015 conference call with investors and analysts to discuss second quarter results, Defendant Zerella stated "Our second-quarter revenue growth was driven by our newest

---

[8] Fitbit PurePulse, https://www.fitbit.com/purepulse (last visited June 30, 2016) (see purported bene-fits described under heading "The Perks of PurePulse").

{00207031;18 }

products, Charge, Charge HR, and Surge, which collectively accounted for approximately 78% of our revenue."

72.    On the second quarter earnings call, Defendant Zerella responded to an analyst's question as follows:

> [Analyst]: The mix of the newer products, the Charge HR, Surge being 78% this quarter, you expect that mix to be relatively constant as the year progresses?
>
> [Zerella]: Yes, Tavis, obviously they already ***dominate our revenue streams***. We would ***expect a similar mix*** through the second half.

73.    On Fitbit's November 2, 2015 conference call with investors and analysts to discuss third quarter results, Defendant Park stated "our new products, Charge, Charge HR, and Surge, obviously represents roughly almost 80% of our business at this point in time."[9]

74.    On the third quarter earnings call, an analyst asked whether Fitbit's revenues would continue to come primarily from Charge HR and Surge. Defendant Park responded, "I think probably the safest bet would be to say we're going to stay within the range that we've been over the last couple of quarters for a while."

75.    In a November 3, 2015 interview for Bloomberg Radio on a segment titled "The Bloomberg Advantage," Defendant Park stated that:

> [O]ur Pure Pulse optical heart rate technology, which is in our Charge HR and Surge devices took over three years to develop, and so, you know, that's resulted in two products which are incredible leaders in the categories. So Fitbit Charge HR is a number one wearable activity tracking device in the market today and Fitbit Surge is the number one GPS fitness watch, so I think that's a great example of how our technology development has resulted in really break-through products.[10]

---

[9] SA Transcripts, *Fitbit's (FIT) CEO James Park on Q3 2015 Results - Earnings Call Transcript*, Seeking Alpha (Nov. 3, 2015 12:34 AM), http://seekingalpha.com/article/3635566-fitbits-fit-ceo-james-park-q3-2015-results-earnings-call-transcript.

[10] Fitbit, Inc., Free Writing Prospectus (Form FWP) at Bloomberg Radio Transcript (Nov. 6, 2015).

{00207031;18 }

76. Ultimately, driven by sales of these products with PurePulse technology, Fitbit's revenues reached a total of $1.858 billion in 2015, compared to $745.4 million in 2014.

77. Because heart-rate monitoring was the key feature of Fitbit's most important products, the accuracy of that heart-rate monitoring was thus crucial to Fitbit's success as a business.

78. Analysts and market commentators confirmed the importance of the accuracy of PurePulse to Fitbit's business. For example, on June 30, 2015, a stock analyst report by RBC Capital Markets discussed a survey in which respondents were asked "What are the features that are important to you in your activity/fitness tracker?" Heart-rate monitoring was the second most frequent response.[11]

79. Because the accuracy of PurePulse was essential to Fitbit's success as a business, any misrepresentations regarding the accuracy of Fitbit's heart-rate tracking would have a material impact on a decision to invest in Fitbit's stock.

## F.    The Truth Emerges

80. Over the course of January 5, 2016 to May 19, 2016, the truth about the inaccuracy of Fitbit's heart-rate tracking devices was revealed in a lawsuit, subsequent reporting, and finally a comprehensive study of Fitbit devices' heart-rate tracking accuracy. Fitbit's stock fell from a high of $30.96 per share on January 5 to a close at $13.99 per share on May 19. This represents an overall loss of 54.8% of the value of Fitbit's stock.

81. The truth began to emerge on January 5, 2016, when a class action lawsuit was filed against Fitbit in the U.S. District Court for the Northern District of California, alleging that the heart-rate monitoring systems on the Company's Charge HR and Surge devices were dangerously inaccurate and posed serious health risks to users. *See McLellan et al. v. Fitbit, Inc.*, 3:16-cv-00036 (N.D. Cal. Jan. 5, 2016) (the "Fitbit Consumer Class Action").

82. The claims against Fitbit in the Fitbit Consumer Class Action included violations of California's Unfair Competition Law and Consumers Legal Remedies Act, common law fraud, and unjust

---

[11] Mark Sue, Spencer Green and Ameet Prabhu, Equity Research Initiation for Fitbit, Inc., RBC Capital Markets (June 30, 2015) at 14-15.

{00207031;18 }

enrichment. Specifically, the complaint alleged that Fitbit's devices significantly undercounted users' heart rates, particularly during exercise, which created a risk of life-threatening overexertion.

83.     For example:

> At an intense personal training session in mid-June 2015, Plaintiff['s] personal trainer manually recorded her heart rate, which was 160 beats per minute ("bpm"). In stark contrast, her Charge HR indicated her heart rate was only 82 bpm. Plaintiff Black was approaching the maximum recommended heart rate for her age, and if she had continued to rely on her inaccurate PurePulse Tracker, she may well have exceeded it, thereby jeopardizing her health and safety.[12]

84.     In addition to the risk of life-threatening overexertion, the Fitbit Consumer Class Action more generally alleged that many consumers "have experienced—and testing confirms—that the PurePulse Trackers consistently mis-record heart rates by a very significant margin, particularly during exercise."[13] This was contrary to Fitbit's advertising, which promised users that the devices allowed users to "accurately track calorie burn all day," "check real-time heart rate" and "use simplified heart rate zones to tailor your workouts on the spot" or "see when your health is improving by analyzing your all-day and resting heart rate trends."

85.     On January 5, 2016, following unusually high trading volume Fitbit's stock closed at $24.30 per share, down from a high of $30.96 per share earlier that same day. On January 5, 2016, the NYSE Composite Index was up slightly, by 0.26%.

86.     On January 5, 2016 a number of online media sources reported on the Fitbit Consumer Class Action and the decline in Fitbit's stock price. In a stock analyst report by SunTrust Robinson Humphrey dated January 6, 2016, the analysts attributed the January 5 stock drop in part to the class action lawsuit.[14]

---

[12] Compl. at ¶ 15, *McLellan et al. v. Fitbit, Inc.*, 3:16-cv-00036 (N.D. Cal. Jan. 5, 2016).

[13] *Id.* at ¶ 3.

[14] Robert S. Peck and Rodney A. Hull, $1.4B Lost in a "Blaze"? Reaction Creates Buying Opportunity, SunTrust Robinson Humphrey (Jan. 6, 2016) at 1.

{00207031;18 }

87.     In addition to the publication of the SunTrust Robinson Humphrey analyst report on January 6, 2016, on that day a number of mass media sources reported on the lawsuit, including Bloomberg, Fortune, and Reuters. One media report published on January 6 quotes a stock analyst with Pacific Crest Securities as stating that the Fitbit Consumer Class Action lawsuit contributed to a "perfect storm" for Fitbit.[15]

88.     On January 6, 2016, the first full day of stock trading after the filing of the Fitbit Consumer Class Action, Fitbit's stock dropped further on unusually high trading volume to close at $22.90 per share, down from the previous day's close of $24.30 per share. While Fitbit stock dropped 5.8% on the day, the NYSE Composite Index only dropped 1.6%.

89.     On January 7, 2016 Fitbit's stock continued to experience unusually high volume and to further decline in value as the markets absorbed the false and misleading nature of the Defendants' prior statements concerning the accuracy of Fitbit heart-rate tracking. Further reporting published on January 7 focused on the Fitbit Consumer Class Action, and linked this lawsuit to the continuing decline in Fitbit's stock price.

90.     For example, a January 7, 2016 article stated in pertinent part: "Fitbit (FIT) stock is tanking 9.39% to $20.75 on heavy volume in afternoon trading on Thursday as users sue the health and fitness products provider over the accuracy of its heart rate monitors."[16]

91.     On January 7, 2016, Fitbit's stock dropped from the previous day's close of $22.90 per share to a low of $20.25 per share (a fall of 11.5%)—as compared to the NYSE Composite Index, which dropped 2.2% on January 7, 2016. From its high price of $30.96 per share on January 5, this represents a loss of 34.6% of the value of Fitbit's stock over the two days following the filing of the Fitbit Consumer Class Action.

---

[15] Patrick Seitz, *Fitbit fall giving investors heart attack*, Investors Business Daily (Jan. 6, 2016) http://www.investors.com/news/technology/click/fitbit-fall-giving-investors-heart-attack/.

[16] Rachel Graf, *Fitbit (FIT) Stock Plummets, Users Sue Over Heart Trackers' Accuracy*, TheStreet (Jan. 7, 2016 1:32 PM) https://www.thestreet.com/story/13416423/1/fitbit-fit-stock-plummets-users-sue-over-heart-trackers-accuracy.html.

92.    From January through May 2016, additional reports confirmed the allegations set forth in the Fitbit Consumer Class Action, and Fitbit's stock price generally continued to decline. Temporarily reversing this downward trend, Fitbit's stock closed at $18.81 per share on January 22, up 3.6% from the previous day's close. On January 22, 2016 Consumer Reports had published an article giving Fitbit devices' heart-rate tracking a favorable review.[17]

93.    After the close of trading on February 22, 2016, Indianapolis television news channel WTHR posted the results of a study to its website under the title "Sometimes your fitness tracker lies – a lot."[18] The study was performed by Dr. Alex Montoye, Assistant Professor of Clinical Exercise Physiology at Ball State University, and found that the Charge HR had an average heart-rate error of 14%--which it described as "bordering on dangerous." For example, the Charge HR reported a heart rate of 68 for a user whose heart rate was actually 91. The article noted that "[c]alculating a heart rate that's off by 20 or 30 beats per minute can be dangerous -- especially for people at high risk of heart disease."

94.    On the next trading day, February 23, Fitbit's stock price plunged 27.9% to close at $13.08 per share. The NYSE Composite Index only dropped 1.3%.

95.    Finally, on May 19, 2016, the complete truth was revealed regarding the inaccuracy of Fitbit's heart-rate tracking. On that date, the Amended Consolidated Master Class Action Complaint was filed in the Fitbit Consumer Class Action (the "Consumer Class Action Amended Complaint").[19] The Consumer Class Action Amended Complaint contained the results of the most thorough study of Fitbit

---

[17] Patrick Austin, *Taking the Pulse of Fitbit's Contested Heart Rate Monitors*, Consumer Reports (Jan. 22, 2016) http://www.consumerreports.org/fitness-trackers/taking-the-pulse-of-fitbits-contested-heart-rate-monitors/.

[18] Bob Segall, *Sometimes your fitness tracker lies – a lot*, WTHR (Feb. 22, 2016 6:09 PM), http://www.wthr.com/story/31285468/sometimes-your-fitness-tracker-lies-a-lot-fitbit-jawbone-garmin-ifit-misfit-accuracy.

[19] Am. Consolidated Compl. at Ex. 1, *McLellan et al. v. Fitbit, Inc.*, 3:16-cv-00036 (N.D. Cal. May 19, 2016).

{00207031;18 }

AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:16-CV-00151-SI

heart-rate monitors performed to date. The study and a corresponding press release were also distributed online on May 19, 2016.[20]

96.    The study, performed by researchers at California State Polytechnic University, Pomona, found that Fitbit devices incorrectly measured heart rate by an average of 20 beats per minute during moderate to high exercise and concluded that Fitbit devices "do not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and cannot be used to provide a meaningful estimate of a user's heart rate."

97.    The Consumer Class Action Amended Complaint further alleged that Fitbit had been unable to provide any studies to validate its representations about the accuracy of its heart-rate monitoring:

> Fitbit has repeatedly told the press that "our team has performed and continues to perform internal studies to validate our products' performance." Yet Fitbit has not referenced a single, specific study which it contends in fact validates its products' performance, nor has it disclosed the details of any study to Plaintiffs' counsel, despite their repeated requests.[21]

98.    Following publication of this news, Fitbit's stock again lost value on May 19, 2016, closing at $13.99, down from the previous day's closing price of $14.13 (a drop of 1.0%). On May 19, 2016, the NYSE Composite Index dropped 0.5%.

99.    As a result of Defendants' false and misleading statements about the accuracy of Fitbit's heart-rate tracking, Fitbit securities were offered and traded at inflated prices. However, after the inaccuracy of Fitbit's heart-rate tracking was revealed by the Fitbit Consumer Class Action, subsequent reporting, and finally a comprehensive study, Fitbit's stock suffered a precipitous decline, losing 54.8%

---

[20] Edward Jo and Brett Dolezal, *Validation of the Fitbit® Surge™ and Charge HR™ Fitness Trackers*, available at http://www.lieffcabraser.com/pdf/Fitbit_Validation_Study.pdf; *Comprehensive Testing Confirms Fitbit's PurePulse™ Heart Rate Monitors "Highly Inaccurate"*, Lieff Cabraser Heimann & Bernstein (May 19, 2016), http://www.lieffcabraser.com/2016/05/comprehensive-testing-confirms-fitbits-purepulse-heart-rate-monitors-highly-inaccurate/.

[21] Am. Consolidated Compl. at ¶ 68, *McLellan et al. v. Fitbit, Inc.*, 3:16-cv-00036 (N.D. Cal. May 19, 2016).

{00207031;18 }

of its market value and thereby causing significant losses and damages to the Lead Plaintiff and other members of the Securities Act Class and the Exchange Act Class.

## VII. THE SECURITIES ACT ACTION

### A.  <u>Standing</u>

100.    Each of the individuals comprising the Lead Plaintiff purchased Fitbit Class A common stock pursuant and/or traceable to the IPO Registration Statement, and was damaged thereby.

101.    According to the IPO Prospectus, there was no public market for Fitbit's Class A common stock before the June 18, 2015 IPO.

102.    According to Fitbit's Form 10-Q filed August 7, 2015, the Company registered 42,061,250 shares of its Class A common stock in connection with the IPO, all of which were sold in the IPO. There were 42,061,250 shares of Fitbit's Class A common stock outstanding as of July 31, 2015. This quarterly report, under the heading "Unregistered Sales of Equity Securities and Use of Proceeds," does not identify any sales of unregistered Class A common stock.

103.    According to Fitbit's Secondary Offering Prospectus, there were 42,061,250 shares of Fitbit's Class A common stock outstanding as of September 30, 2015.

104.    According to Fitbit's Form 10-Q filed November 2, 2015, there were 42,061,250 shares of Fitbit's Class A common stock outstanding as of October 31, 2015. This quarterly report, under the heading "Unregistered Sales of Equity Securities and Use of Proceeds," does not identify any sales of unregistered securities.

105.    Therefore, any purchases of Fitbit Class A common stock by members of the public between the June 18, 2015 IPO and the November 13, 2015 Secondary Offering are directly traceable to the IPO and IPO Registration Statement.

106.    Plaintiff Flynn purchased 54,157 shares of Fitbit Class A common stock on June 19, 2015 and purchased 18,859 shares on July 15, 2015.[22]

---

[22] Timothy Flynn Certification, Mar. 2, 2016, ECF No. 15-2.

{00207031;18 }

107. Plaintiffs Jesse and Kelley Koth made 15 separate purchases of Fitbit Class A common stock between August 6, 2015 and November 11, 2015, totaling 28,000 shares.[23]

108. Plaintiff Tran purchased 39,574 shares of Fitbit Class A common stock on August 6, 2015; 30,000 shares on August 24, 2015; and 23,870 shares on November 2, 2015.[24]

109. Plaintiff Cunningham made dozens of separate purchases of Fitbit Class A common stock between September 15, 2015 and November 12, 2015, totaling thousands of shares.[25]

110. The individuals comprising the Lead Plaintiff (and numerous other members of the Securities Act Class) purchased shares that are directly traceable to the IPO Registration Statement.

**B.**     **False and Misleading Statements in the IPO Registration Statement**

111. The IPO Prospectus, filed as part of the IPO Registration Statement, contained material omissions and numerous statements that were materially false and misleading, because they led investors to believe that Fitbit's heart-rate tracking devices had "highly accurate measurements"[26] at all times, including during "higher intensity"[27] fitness activities. As would later become clear, Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high-intensity activities.

**1.     Statements Regarding Heart-Rate Accuracy Generally**

112. The IPO Prospectus Summary states:

> We dedicate significant resources to developing proprietary sensors, algorithms, and software to ensure that *our products have highly accurate measurements*, insightful analytics, compact sizes, durability, and long battery lives.[28]

---

[23] Jesse Koth and Kelley Koth Certification, Jan. 14, 2016, ECF No. 15-2.

[24] Viet Tran Certification, Feb. 8, 2016, ECF No. 15-2.

[25] Mark Cunningham Certification, Feb. 1, 2016, ECF No. 15-2.

[26] Fitbit, Inc., Prospectus (Form 424B4), at 86 (June 18, 2015).

[27] *Id*. at 93.

[28] *Id*. at 1.

{00207031;18 }

113.    Under the headings "Our Competitive Strengths—What Sets Us Apart" and "Advanced, purpose-built hardware and software technologies" the IPO Prospectus states:

> Our connected health and fitness devices leverage industry-standard technologies, such as Bluetooth low energy, as well as ***proprietary technologies, such as our PurePulse continuous heart rate tracking, and our algorithms that more accurately measure*** and analyze user health and fitness metrics.[29]

114.    Under the headings "Our Solution—The Fitbit Platform" and "Tracking activities through our connected health and fitness devices" the IPO Prospectus states:

> Our devices, which include wrist-based and clippable fitness trackers and our Wi-Fi connected scale, feature ***proprietary and advanced sensor technologies and algorithms as well as high accuracy*** and long battery life.[30]

115.    Under the heading "What Our Connected Health and Fitness Devices Track" and the sub-heading "Heart rate," the IPO Prospectus states:

> On trackers that are outfitted with our proprietary PurePulse technology, our users are able to ***automatically and continuously track their heart rate during everyday activity and exercise***. Our PurePulse technology uses wrist-based optical LEDs, which measures heart rate using light reflection. We believe our PurePulse technology ***makes heart rate relevant as a means to more accurately measure calorie burn, maintain intensity during exercise, and train more effectively by using heart rate zones***. Additionally, our heart rate tracking technology can conveniently provide our users with their resting heart rate, which is a widely used indicator of cardiovascular fitness and conditioning.[31]

116.    These statements were materially false and misleading because Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during exercise.

---

[29] *Id*. at 90.

[30] *Id*. at 89.

[31] *Id*. at 93.

{00207031;18 }

### 2. Statements Regarding Suitability for High Intensity Activity

117.    The IPO Prospectus further described the Charge HR and Surge as suitable for use during vigorous exercise and other high-intensity activity, falsely implying that the Charge HR and Surge delivered accurate heart-rate readings during such activities.

118.    The IPO Prospectus describes Fitbit Charge HR as "a wireless heart rate and activity wristband for Active users."[32] It describes "active users" as "often interested in monitoring exercise intensity through heart rate tracking in addition to activity tracking."[33]

119.    Likewise, the IPO Prospectus describes Fitbit Surge as a "fitness 'super watch' for Performance users" and states that it "can **track heart rate during a variety of distinct cardiovascular workouts** and other exercises."[34] It describes "performance users" as people who "train regularly to improve their performance and achieve their personal bests," "participate in endurance sports and fitness activities with higher intensity and longer duration, such as interval or distance running and cycling, and thrive on personal improvement and competition."[35]

120.    These statements were materially false and misleading because Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high-intensity activities, including "endurance sports and fitness activities with higher intensity and longer duration, such as interval or distance running and cycling."[36]

### VIII. SECURITIES ACT CLASS ACTION ALLEGATIONS

121.    Lead Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of all persons who purchased or otherwise acquired Fitbit Class A common stock pursuant and/or traceable to the Company's IPO (the "Securities Act Class").  Excluded from the Securities Act

---

[32] *Id*. at 94.

[33] *Id*. at 92.

[34] *Id*. at 94-95.

[35] *Id*. at 93.

[36] *Id*. at 93.

{00207031;18 }

Class are Defendants and their family members, directors, and officers of Fitbit and their families and affiliates.

122.   The members of the Securities Act Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. More than 42 million shares were sold in the IPO. These shares have been purchased by hundreds or thousands of persons.

123.   There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Securities Act Class that predominate over questions that may affect individual Securities Act Class members include:

(a)   Whether the Securities Act was violated by Securities Act Defendants;

(b)   Whether Securities Act Defendants omitted and/or misrepresented material facts;

(c)   Whether Securities Act Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   The extent of damage sustained by Securities Act Class members and the appropriate measure of damages.

124.   Lead Plaintiff's claims are typical of those of the Securities Act Class because Lead Plaintiff and the Securities Act Class sustained damages as a result of the material omissions and misrepresentations contained in the IPO Registration Statement.

125.   Lead Plaintiff will adequately protect the interests of the Securities Act Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Securities Act Class.

126.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

{00207031;18 }

# IX. THE EXCHANGE ACT ACTION

### A.    False and Misleading Statements Pertinent to the Exchange Act Claim

127.    Leading up to and throughout the Exchange Act Class Period, the Exchange Act Defendants made materially false and misleading statements that led investors to believe that Fitbit's heart-rate tracking devices had "highly accurate measurements"[37] at all times, including during "higher intensity"[38] fitness activities. In fact, Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high intensity activities.

### 1.    Statements to the Press Leading up to the June 2015 IPO

128.    In a press release dated October 27, 2014 Fitbit announced the introduction of its Charge HR and Surge devices.[39] That press release made numerous false and misleading statements about the accuracy of Fitbit's PurePulse heart-rate monitoring technology.

129.    The October 27, 2014 press release, under the heading "***Every Beat Counts*** with Fitbit Charge HR," described the Charge HR as "an advanced tracker that delivers continuous, automatic wrist-based heart rate." It further states that the Charge HR "applies Fitbit's finely tuned algorithms to deliver heart rate tracking 24/7." This language misleads the reader into believing that the device can track every beat of a wearer's heart, when in fact Fitbit's devices were often highly inaccurate.

130.    Fitbit's October 2014 press release further stated that the Charge HR allowed users to:

- Get accurate calorie burn for more activities—during exercise and everyday activities like walking, running, biking, lifting weights, spinning, skiing, yoga, Pilates and more

- ***Maximize training with fat burning, cardio and peak heart rate zones***

- ***Maintain workout intensity by reaching your target heart rate***

---

[37] Fitbit, Inc., Prospectus (Form 424B4), at 86 (June 18, 2015).

[38] *Id.* at 93.

[39] Press Release, Fitbit, Inc., Fitbit Announces Fitbit Charge, Fitbit Charge HR and Fitbit Surge (Oct. 27, 2014) available at https://investor.fitbit.com/press/press-releases/.

{00207031;18 }

- Optimize health through heart rate trends and resting heart rate, an important measure of overall heart health and cardiovascular fitness

131.    These statements falsely implied that Fitbit's heart-rate monitoring was accurate enough to determine whether a user had reached a "target heart rate" and whether a user's heart rate was in the "fat burning," "cardio" or "peak" heart rate zone. However, Fitbit's devices were highly inaccurate during exercise and thus unable to help users "maximum training" or "maintain workout intensity" based on their heart rates.

132.    Under the heading "Train Smarter, Go Farther with Fitbit Surge," Fitbit's October 2014 press release described the Surge as providing "continuous wrist-based heart rate, all-day fitness tracking and smartwatch functionality in one device, for people dedicated to reaching their peak performance" with the "most advanced tracking . . . on the market" and "comprehensive [workout] summaries with tailored metrics, *workout intensity based on heart rate* and calories burned." It further touted the Surge as follows:

> "I never stop trying to shatter my personal bests, whether it's pushing myself to go longer distances, *maximizing training through a variety of different types of workouts* or quickening my pace across my usual routes," said Dean Karnazes, world-renowned ultra marathoner and Fitbit brand ambassador. "The new Fitbit Surge is ideal for fitness enthusiasts like myself. Having the multi-sport Fitbit Surge with me all day *helps me reach peak performance and intensity* through insights into my activity 24/7, so I have the information I need to train more effectively and efficiently."

133.    These statements falsely implied that the Surge's heart-rate monitoring was accurate enough to determine a user's "workout intensity based on heart rate" and to help users "reach peak performance and intensity through insights into my activity 24/7."

134.    In a January 6, 2015 press release, Fitbit further touted PurePulse as "superior heart rate tracking" that is "continuous and automatic so the technology *works no matter what you're doing*."[40] It

---

[40] Press Release, Fitbit, Inc., Fitbit Announces Global Availability of Highly Anticipated Fitbit Charge HR and Fitbit Surge (Jan. 6, 2015) available at https://investor.fitbit.com/press/press-releases/.

{00207031;18 }

contained the heading "***Make Every Beat Count*** with Fitbit Charge HR" and described the Charge HR and Surge as follows:

> ***Superior heart rate tracking technology***. Fitbit Charge HR and Fitbit Surge don't just track resting heart rate—they both offer ***continuous, automatic heart rate tracking all day, all night and during workouts so you never miss a beat***. PurePulse heart rate tracking provides more accurate calorie burn, ***the ability to maintain your workout intensity, maximize your training*** and optimize your all day health and fitness.

135.    The January 2015 press release further described PurePulse as allowing users to "[m]ore accurately track all-day calorie burn for exercises that aren't step-based, like cycling, elliptical or group exercise classes" and to "[h]it fat burn, cardio and peak intensity with simplified heart rate zones and track resting heart rate over time to optimize overall health."

136.    These statements falsely implied that Fitbit's heart-rate monitoring was accurate enough to count "every beat" and/or "never miss a beat," even "during workouts." It also falsely implied that Fitbit's heart-rate monitoring was accurate enough to determine whether a user's heart rate was in the "fat burning," "cardio" or "peak" heart rate zone and whether a user was maintaining any particular workout intensity.

137.    In a March 19, 2015 interview in Time Magazine, Defendant Park created the impression that Fitbit products were currently accurate enough to serve medical purposes, or would be accurate enough to do so in the foreseeable future. For example:

> I think there'll be a next big leap in benefits ***once we tie into more detailed clinical research*** and cross the hurdles and ***dialogue with the FDA*** about what we can do for consumers and what's regulated or not.[41]

138.    The article continues:

---

[41] Alex Rogers, *How Fitbit's CEO Sees a Future In the Medical Industry*, Time (Mar. 19, 2015) http://time.com/3751693/fitbit-ceo-medical-industry/.

{00207031;18 }

Park says that consumer-oriented wearable technology produced by companies like Fitbit could further help customers in the coming few years by making sense of data and *making "lightweight" medical diagnoses*.

139.    In a March 27, 2015 Washington Post article, Defendant Park stated that PurePulse was "the result of three years of R&D effort by our team."[42] During his interview with the Washington Post, Defendant Park wore a Fitbit Surge and reported its heart-rate readings to his interviewer. The article states, "His heart rate was 69 beats per minute when we wrapped up our conversation, according to the Fitbit Surge he was wearing. (That was up slightly from his resting heart rate, 60 beats per minute)." This creates a misleading impression that Fitbit Surge is capable of accurately measuring a wearer's heart rate to the point that a 9 beat per minute difference in readings is meaningful.

### 2.    IPO Registration Statement

140.    Each of the false and misleading statements in the IPO Registration Statement Prospectus (described above in ¶¶ 111-120) is also a false and misleading statement for purposes of the Exchange Act Claims, and is incorporated here by reference.

### 3.    Statements to the Press After the June 2015 IPO

141.    A June 25, 2015 article[43] contains the following exchange between an interviewer and Defendant Park:

> [Q]: *Will anyone in wrist-wearables get optical heart rate sensors right*?

> [Park]: *That's implying that they're all wrong today, which I disagree with*. With any technology there's always a tradeoff. In some cases, there's accuracy in certain situations.

> [Q]: Are you pleased with the optical HR tracking on the Surge?

---

[42] Matt McFarland, *Fitbit's CEO discusses the looming Apple Watch, and how having friends with Fitbits makes you healthier*, Washington Post (Mar. 27, 2015) https://www.washingtonpost.com/news/innovations/wp/2015/03/27/fitbits-ceo-discusses-the-looming-apple-watch-and-how-having-friends-with-fitbits-makes-you-healthier/.

[43] Lauren Goode, *Fitbit CEO Says He 'Thinks Differently' About Apple*, recode (June 25, 2015) http://www.recode.net/2015/6/25/11563866/fitbit-ceo-says-he-thinks-differently-about-apple.

{00207031;18 }

[Park]: I wear it 24/7 so *I'm happy with it*.

[Q]: But not everyone is.

[Park]: Look, there are tradeoffs ... With research and advancements in technology, there are always going to be major advancements in accuracy, battery life and form factor.

### 4.    August 2015 Earnings Call

142.    In a conference call with Fitbit investors and stock market analysts on August 5, 2015, Defendant Park stated "the PurePulse technology in Charge HR and Surge took many, many years to develop and perfect. The key thing for us is we will only launch products when we feel that they're ready."[44]

143.    This statement falsely implied that PurePulse technology was "ready" for the purposes for which Fitbit advertised the Charge HR and Surge, including vigorous exercise. In fact, Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during such high-intensity activities.

### 5.    Secondary Offering Registration Statement

144.    The Secondary Offering Prospectus, filed on November 13, 2015 as part of the Secondary Offering Registration Statement, was materially false and misleading because it led investors to believe that Fitbit's heart-rate tracking devices had "highly accurate measurements"[45] at all times, including during "higher intensity"[46] fitness activities. As would later become clear, Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high intensity activities.

---

[44] Thopmson Reuters StreetEvents, *Edited Transcript of FIT earnings conference call or presentation 5-Aug-15 9:00pm GMT*, Yahoo! Finance (Aug. 6, 2015 2:38 AM), http://finance.yahoo.com/news/edited-transcript-fit-earnings-conference-063828001.html.

[45] Fitbit, Inc., Prospectus (Form 424B4), at 80 (Nov. 13, 2015).

[46] *Id*. at 86.

{00207031;18 }

145.    The Secondary Offering Prospectus repeated verbatim each of the IPO Prospectus's above cited (at ¶¶ 111-120) false and misleading statements about the accuracy of Fitbit's heart-rate monitoring, and about the ability of Fitbit devices to track heart rates during high intensity activities.

146.    The statements referenced in ¶¶ 111-120 were materially false and misleading because Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during high intensity activities.

### 6.    Statements to the Press After the Secondary Offering

147.    In a press release dated November 23, 2015, Fitbit describes "enhancements to Pure-Pulse™ heart rate tracking to Fitbit Charge HR™ and Fitbit Surge™" as follows:

> ***Enhanced Real-Time Heart Rate Tracking*** During Workouts
>
> Fitbit's proprietary PurePulse heart rate technology has been updated to provide users with an ***even better heart rate tracking experience during and after high-intensity workouts like boot camp and Zumba***. The update is activated when using Exercise Mode on Fitbit Charge HR and multi-sport modes on Fitbit Surge. PurePulse optical technology provides users with ***continuous, automatic wrist-based heart rate tracking including resting heart rate and heart rate trends over time*** - without the need for an uncomfortable chest strap.
>
> Fitbit is dedicated to developing ***the most consistently accurate*** wrist-based activity trackers on the market. This software update ***improves upon an already positive heart rate tracking*** offering.[47]

148.    These statements were materially false and misleading because Fitbit's heart-rate tracking devices were frequently inaccurate and were particularly inaccurate during "high-intensity workouts like boot camp and Zumba." The Exchange Act Defendants failed to disclose information known to them about the inaccuracy of Fitbit devices' heart-rate tracking.

### B.    Scienter Allegations

149.    Each of Defendants Park, Zerella, and Friedman:

---

[47] Press Release, Fitbit, Inc., Fitbit Charge HR and Fitbit Surge Now Automatically Track Common Exercises Like Biking, Hiking, Running, and Sports Including Basketball, Soccer and Tennis (Nov. 23, 2015), available at https://investor.fitbit.com/press/press-releases/.

{00207031;18 }

      a.   directly participated in the management of the Company;

      b.   was directly involved in the day-to-day operations of the Company at the highest levels;

      c.   was privy to confidential proprietary information concerning the Company and its business and operations;

      d.   was involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein;

      e.   was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and

      f.   approved or ratified these statements in violation of the federal securities laws.

150.    As officers, directors, and controlling persons of a publicly-held company whose securities are and were registered with the SEC pursuant to the Exchange Act, and traded on NYSE and governed by the provisions of the federal securities laws, Defendants Park, Zerella, and Friedman each had a duty to disseminate accurate and truthful information promptly with respect to the Company's business prospects and operations, and to correct any previously-issued statements that had become materially misleading or untrue to allow the market price of the Company's publicly-traded stock to reflect truthful and accurate information.

151.    In violation of this duty, Defendants Park, Zerella, and Friedman knew and/or recklessly disregarded that their statements concerning the accuracy of the Company's heart-rate monitoring technology were materially false and misleading.

### 1.    PurePulse's Accuracy Was Crucial to Fitbit's Revenue and Growth

152.    Fitbit's Charge HR and Surge devices were key revenue drivers for the Company; together with the Charge, these devices provided Fitbit with 80% of its 2015 revenue.

153.    Fitbit actively marketed the Charge HR and Surge to what it called "active users" and "performance users," who were especially interested in real-time heart-rate monitoring during exercise.

154.    Performance users required particularly accurate heart-rate readings in order to optimize their workouts in the ways suggested by Fitbit's advertising of the Surge.

{00207031;18 }

155.     Accordingly, the accuracy of Fitbit's real-time heart-rate monitoring during exercise was crucial to Fitbit's revenue stream and growth strategy.

156.     However, as early as January 2015, product reviews on Amazon.com reported that the Charge HR was "absolutely horrible for tracking heart rate during exercise," "completely inaccurate if you're doing anything besides steady state cardio like a jog," "horribly inaccurate when doing any . . . high intensity interval training," "fairly useless as a HR monitor during any exercise other than jogging," and prone to under-reporting users' heart rates by up to 50%.

157.     In preparing for its IPO, the Company's management had an incentive to inflate the Company's prospects in the eyes of investors by failing to disclose that its PurePulse heart-rate monitoring technology was highly inaccurate, particularly during the very intense physical activities for which Fitbit expressly marketed it.

### 2.     Personal Use

158.     Defendants Park and Zerella, and upon information and belief Friedman, used the Charge HR and/or Surge personally.

159.     For example, an article dated June 19, 2015 states that Defendant Zerella uses a Fitbit device "to monitor his heart rate while doing intense exercise."[48]

160.     Upon information and belief, Defendants Park, Zerella, and Friedman knew of the limited accuracy of Fitbit's heart-rate monitoring devices through their own personal use of these devices.

161.     Defendant Park made statements suggesting that he understood that the accuracy of Fitbit's heart-rate monitoring was limited. Park was asked when "anyone in wrist-wearables" would "get optical heart rate sensors right." He responded that "[w]ith any technology there's always a tradeoff. In some cases, there's accuracy in certain situations."[49]

---

[48] David M. Katz, *Fitbit CFO's Heart is Pumping*, CFO (June 19, 2015) http://ww2.cfo.com/ipos/2015/06/fitbit-cfos-heart-pumping/.

[49] Lauren Goode, *Fitbit CEO Says He 'Thinks Differently' About Apple*, recode (June 25, 2015) http://www.recode.net/2015/6/25/11563866/fitbit-ceo-says-he-thinks-differently-about-apple.

{00207031;18 }

### 3.    Stock Sales

162.    In a conference call with Fitbit investors and stock market analysts on November 2, 2015 Defendant Park stated "Based on the Company's execution in the third quarter, I've never been more confident in Fitbit's future." Less than two weeks later, Defendant Park sold 11% of his Fitbit stock in the Company's Secondary Offering.

### 4.    Confidential Witnesses

163.    Moreover, confidential witnesses reported that Fitbit employees and management were well aware of the inaccuracy of the Company's heart-rate monitoring technology.

164.    Confidential Witness 1 was a data scientist at Fitbit from November 2014 to December 2015. CW1 was a paid contractor and consultant, hired specifically to develop quality-assurance analytics for Fitbit's Charge HR, Surge, and other wearable devices.

165.    According to CW1, Fitbit had two large sources of data concerning the efficacy of its products: (1) biometric data from Fitbit's online user accounts and (2) customer complaints. But as of November 2014, Fitbit had no methods for analyzing these data sources, either for purposes of quality assurance or product development. Instead of learning from its device failures, Fitbit's practice was simply to send a replacement or upgraded Fitbit device to anyone who complained for any reason.

166.    By the summer of 2015, CW1 began presenting Fitbit Chief Operations Officer Hansgregory "Hans" C. Hartmann with monthly reports that documented and ranked various types of customer complaints and device failures.

167.    According to CW1, by June or July 2015, his monthly reports noted significant issues with the accuracy of Fitbit's heart-rate monitoring, relative to other types of failures.

168.    For example, sweat, dirt, or other impurities often interfered with the optical sensor, resulting in highly inaccurate readings. There was also a consistent problem with female users with thin wrists, because the wristband would not fit properly and would thus move around constantly, interfering with the wristband's ability to detect changes in blood volume over time and resulting in highly inaccurate readings.

{00207031;18 }

169.    At some point around August or September 2015, CW1 made a PowerPoint presentation to Fitbit Senior Director of Product Engineering Tina Dao and Fitbit VP of Product Engineering Sam Bowen about these problems, including with respect to inaccurate heart-rate monitoring. Although Hartmann did not attend that presentation, Dao reported to Hartmann.

170.    Although CW1 presented several recommendations in that PowerPoint, these recommendations were ignored.

171.    Moreover, according to CW1, Fitbit never commissioned scientific or medical studies, or any kind of third-party testing, to assess its products' tracking and monitoring features or to validate their accuracy or consistency. Instead, CW1 said that Fitbit's quality-assurance program consisted largely of a group of athletes who exercised while wearing Fitbit devices and then recorded the results.

172.    According to CW1, Fitbit's office had an area specifically for these athletes' testing (the "Testing Area"), with fitness equipment and computer workstations for recording the athletes' data.

173.    According to CW1, in June and July 2015, the Fitbit employees who worked with the athletes' data were focused entirely on testing and understanding the inaccuracies in Fitbit's heart-rate monitoring, rather than on other issues.

174.    According to CW1, Defendant Park frequently visited the Testing Area.

175.    Confidential Witness 2 was a contract fitness tester at Fitbit from February 2015 to April 2015 and then a Fitness Tester Manager from April 2015 until July 2015. CW2 worked as an independent contractor.

176.    CW2 confirmed that Fitbit hired him primarily to test the accuracy of Fitbit's heart-rate monitoring devices and that Fitbit management was concerned with their accuracy.

177.    As Fitness Tester Manager, CW2 managed a team of 8 to 10 fitness testers, supervising them as they performed various exercises while wearing Fitbit devices and then managing the logging of their heart-rate results. CW2 ultimately reported to Fitbit Chief Operating Officer Hartmann.

178.    Upon information and belief, CW2 managed the same team of athletes referenced by CW1.

{00207031;18 }

179.    CW2 found Fitbit's heart-rate monitoring devices to be highly inaccurate, particularly during vigorous exercise. For example, if a user's wrist was sweaty, the heart-rate results reported by Fitbit's devices were useless. CW2 also reported that the results were often inaccurate for users with either very light or very dark skin tones.

180.    Confidential Witness 3 was an executive assistant at Fitbit from January 2015 until July 2015. According to CW3, because the Testing Area was adjacent to a dining area, Fitbit employees were widely familiar with the Testing Area as well as with the underlying problems with the accuracy of Fitbit's heart-rate monitoring.

181.    According to CW3, Defendant Zerella was well aware of the Testing Area and even considered providing it with additional office space.

**5.    Corporate Scienter**

182.    Fitbit is liable for the acts of Defendants Park, Zerella, and Friedman, and the acts of its employees, under the doctrine of respondeat superior and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment with authorization.

183.    In particular, Fitbit Chief Operations Officer Hartmann reported directly to Fitbit CEO, Defendant Park.

184.    According to CW3, Hartmann attended weekly executive staff meetings with Defendants Park and Zerella, where much of the Company's business and decision-making was done.

185.    CW1 reported directly to Hartmann, and CW2 indirectly reported to Hartmann. CW1 and CW2 both provided Hartman with information about the inaccuracy of Fitbit's heart-rate monitoring devices.

186.    CW1 believes Hartmann provided CW1's findings and recommendations to members of the Company's executive team, including Park.

187.    Upon information and belief, Defendants Park, Zerella, and Friedman were aware of CW1's findings and recommendations when making public statements to investors.

{00207031;18 }

188.    Accordingly, Mr. Hartmann's knowledge and/or reckless disregard of the Company's problems with inaccurate heart-rate monitoring is imputed to the Company.

## X. EXCHANGE ACT CLASS ACTION ALLEGATIONS

189.    Lead Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23 on behalf of all persons who purchased or otherwise acquired Fitbit securities on the open market between June 18, 2015 and May 19, 2016, both dates inclusive (the "Exchange Act Class").  Excluded from the Exchange Act Class are Defendants and their family members, directors and officers of Fitbit and their families and affiliates.

190.    The members of the Exchange Act Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. Fitbit has more than 100 million shares of stock outstanding, owned by hundreds or thousands of persons.

191.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Exchange Act Class that predominate over questions that may affect individual Exchange Act Class members include:

(a)    Whether the Exchange Act was violated by Exchange Act Defendants;

(b)    Whether Exchange Act Defendants omitted and/or misrepresented material facts;

(c)    Whether Exchange Act Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not mis-leading;

(d)    Whether Exchange Act Defendants knew or recklessly disregarded that their state-ments were false and misleading;

(e)    Whether the price of Fitbit common stock was artificially inflated; and

(f)    The extent of damage sustained by Exchange Act Class members and the appro-priate measure of damages.

{00207031;18 }

AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:16-CV-00151-SI

192.    Lead Plaintiff's claims are typical of those of the Exchange Act Class because Lead Plaintiff and the Exchange Act Class sustained damages from the Exchange Act Defendants' wrongful conduct.

193.    Lead Plaintiff will adequately protect the interests of the Exchange Act Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Exchange Act Class.

194.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

195.    Lead Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Exchange Act Defendants made public misrepresentations or failed to disclose material facts;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e)    Lead Plaintiff and other members of the Exchange Act Class purchased Fitbit common stock between the time Exchange Act Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

196.    At all relevant times, the market for Fitbit's common stock was efficient for the following reasons, among others:

(a) As a regulated issuer, Fitbit filed periodic public reports with the SEC; and

(b) Fitbit regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

{00207031;18 }

AMENDED CLASS ACTION COMPLAINT – CASE NO. 3:16-CV-00151-SI

197.    As a result of the foregoing, the market for Fitbit's securities promptly digested current information regarding Fitbit from all publicly available sources and reflected such information in Fitbit's stock price.  Under these circumstances, all purchasers of Fitbit's securities at relevant times suffered similar injury through their purchases of Fitbit's securities at artificially inflated prices, and a presumption of reliance applies.

## XI. COUNT I

### Violation of Section 10(b) of the Exchange Act

### and Rule 10b-5 Promulgated Thereunder Against Exchange Act Defendants

198.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

199.    Exchange Act Defendants carried out a plan, scheme and course of conduct which was intended to and did: (1) deceive the investing public, including Lead Plaintiff and other Exchange Act Class members, as alleged herein; and (2) cause Lead Plaintiff and other members of the Exchange Act Class to purchase Fitbit's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each of the Exchange Act Defendants took the actions set forth herein.

200.    Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Fitbit securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. All Exchange Act Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

201.    Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business and future prospects of Fitbit as specified herein.

{00207031;18 }

202.    These Exchange Act Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information, and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fitbit's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Fitbit and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Fitbit securities.

203.    For each of Defendants Park, Zerella, and Friedman, his primary liability, and controlling person liability, arises from the following facts: (1) Defendants Park, Zerella, and Friedman were high-level executives, directors, and/or agents at the Company at all relevant times and members of the Company's management team or had control thereof; (2) each of these Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's business prospects and operations; (3) each of these Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's operations and business projects at all relevant times; and (4) each of these Defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

204.    Exchange Act Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Exchange Act Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the Company's flawed manufacturing processes, thereby artificially inflating price of its securities. As demonstrated by Exchange Act Defendants' omissions and misstatements of the Company's business strategy, Exchange Act Defendants, if they did not have actual

{00207031;18 }

knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

205. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Fitbit securities was artificially inflated. In ignorance of the fact that market prices of Fitbit's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Exchange Act Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Exchange Act Defendants but not disclosed in public statements by Exchange Act Defendants, Lead Plaintiff and the other members of the Exchange Act Class acquired Fitbit securities at artificially high prices and were or will be damaged thereby.

206. At the time of said misrepresentations and omissions, Lead Plaintiff and other members of the Exchange Act Class were ignorant of their falsity, and believed them to be true. Had Lead Plaintiff and the other members of the Exchange Act Class and the marketplace known the truth regarding the Company's flawed manufacturing processes, which was not disclosed by Exchange Act Defendants, Lead Plaintiff and other members of the Exchange Act Class would not have purchased or otherwise acquired their Fitbit securities, or, if they had acquired such securities, they would not have done so at the artificially inflated prices that they paid.

207. By virtue of the foregoing, Exchange Act Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

208. As a direct and proximate result of Exchange Act Defendants' wrongful conduct, Lead Plaintiff and the other members of the Exchange Act Class suffered damages in connection with their respective purchases and sales of the Company's securities.

209. This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

## XII. COUNT II

### Violation of Section 20(a) of the Exchange Act Against

{00207031;18 }

**Defendants Park, Zerella, and Friedman**

210.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

211.    Defendants Park, Zerella, and Friedman acted as controlling persons of Fitbit within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company and disseminated to the investing public, Defendants Park, Zerella, and Friedman had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are false and misleading. Defendants Park, Zerella, and Friedman were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Lead Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

212.    In particular, each of Defendants Park, Zerella, and Friedman had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

213.    As set forth above, Fitbit and Defendants Park, Zerella, and Friedman each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

214.    By virtue of their positions as controlling persons, Defendants Park, Zerella, and Friedman are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Exchange Act Defendants' wrongful conduct, Lead Plaintiff and other members of the Exchange Act Class suffered damages in connection with their purchases of the Company's securities.

215.    This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

{00207031;18 }

# XIII. COUNT III

## Violation of Section 11 of the Securities Act Against Securities Act Defendants

216.    Lead Plaintiff repeats and incorporates ¶¶ 1-2, 4-27, and 29-126 as if fully set forth herein. This Count III does not incorporate any allegation of fraud, recklessness, or intentional misconduct.

217.    This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Securities Act Class, against the Securities Act Defendants.

218.    The IPO Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

219.    Fitbit is the registrant for the IPO. Individual Defendants named herein signed the Registration Statement, and were responsible for the contents and dissemination of the IPO Registration Statement.

220.    The Underwriter Defendants each acted as an underwriter in the sale of stock in the IPO, directly and indirectly participated in the distribution of the stock in the IPO, and directly and indirectly participated in drafting and disseminating the offering documents for the stock in the IPO.

221.    As issuer of the shares, Fitbit is strictly liable to Lead Plaintiff and the Securities Act Class for the misstatements and omissions.

222.    By reasons of the conduct herein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

223.    This action is being brought within one year of the discovery of the false and misleading statements in the IPO Registration Statement and the IPO Prospectus, and fewer than three years after the securities were offered to the public.

224.    Lead Plaintiff acquired Fitbit securities pursuant and/or traceable to the IPO Registration Statement.

225.    Fitbit offered its shares at a price of $20.00 per share in the IPO on June 18, 2015. This action was filed on January 11, 2016. On January 11, 2016 Fitbit's stock traded at a low price of $18.35 per share and closed at $18.85 per share.

{00207031;18 }

## XIV. COUNT IV

### Violation of Section 15 of the Securities Act Against

### Defendants Park, Zerella, and Friedman

226.    Lead Plaintiff repeats and incorporates ¶¶ 1-2, 4-27, 29-126, and 216-225 as if fully set forth herein. This Count IV does not incorporate any allegation of fraud, recklessness, or intentional misconduct.

227.    This count is asserted against Defendants Park, Zerella, and Friedman and is based upon Section 15 of the Securities Act.

228.    Defendants Park, Zerella, and Friedman, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Fitbit within the meaning of Section 15 of the Securities Act. Defendants Park, Zerella, and Friedman had the power and influence and exercised the same to cause Fitbit to engage in the acts described herein.

229.    By virtue of the conduct alleged herein, Defendants Park, Zerella, and Friedman are liable for the aforesaid wrongful conduct and are liable to Lead Plaintiff and the Securities Act Class for damages suffered.

**WHEREFORE**, Lead Plaintiff prays for relief and judgment, as follows:

A.    Determining under Federal Rule of Civil Procedure 23 that this action is a proper class action, certifying Lead Plaintiff as a class representative for the Securities Act Class and the Exchange Act Class, and certifying Lead Plaintiff's counsel as Class Counsel for both classes;

B.    Awarding compensatory damages in favor of Lead Plaintiff and the other Securities Act Class members against all Securities Act Defendants, jointly and severally, for all damages sustained as a result of Securities Act Defendants' violations of the Securities Act, in an amount to be proven at trial, including interest thereon;

C.    Awarding compensatory damages in favor of Lead Plaintiff and the other Exchange Act Class members against all Exchange Act Defendants, jointly and severally, for all damages sustained as a result of Exchange Act Defendants' violations of the Exchange Act, in an amount to be proven at trial, including interest thereon;

{00207031;18 }

D.     Awarding Lead Plaintiff, the Securities Act Class, and the Exchange Act Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

E.     Such other and further relief as the Court may deem just and proper.

## XV. JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED: July 1, 2016

**GLANCY PRONGAY & MURRAY LLP**
By: _s/ Brian P. Murray_
Brian P. Murray (*pro hac vice pending*)
122 East 42nd Street, Suite 2920
New York, New York 10168
Telephone:    (212) 682-5340
Facsimile:    (212) 884-0988
Email:         bmurray@glancylaw.com

**GLANCY PRONGAY & MURRAY LLP**
Lionel Z. Glancy (SBN #134180)
Robert V. Prongay (SBN #270796)
Casey E. Sadler (SBN #274241)
Lesley F. Portnoy (SBN #304851)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:    (310) 201-9150
Facsimile:    (310) 201-9160
Email:         rprongay@glancylaw.com

**POMERANTZ LLP**
Jeremy A. Lieberman
Murielle J. Steven Walsh
Aatif Iqbal
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:    (212) 661-1100
Facsimile:    (212) 661-8665
Email:         jalieberman@pomlaw.com
              mjsteven@pomlaw.com
              aiqbal@pomlaw.com

{00207031;18 }

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:    (312) 377-1181
Facsimile:    (312) 377-1184
Email:        pdahlstrom@pomlaw.com

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
468 North Camden Drive
Beverly Hills, CA 90210
Telephone:    (818) 532-6449
Email:        jpafiti@pomlaw.com

*Lead Counsel for Plaintiffs*

{00207031;18 }