UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BRIAN H. ROBB,

        Plaintiff,

    v.

FITBIT INC., et al.,

        Defendants.

Case No. 16-cv-00151-SI

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**

Re: Dkt. Nos. 107, 110

Defendants have brought motions to dismiss the claims of Lead Plaintiff Fitbit Investor Group. Dkt. Nos. 107, 110. Pursuant to Civil Local Rule 7-1(b), the Court determines that this matter is appropriate for resolution without oral argument and VACATES the hearing set for October 28, 2016. For the reasons set forth below, the Court DENIES defendants' motions to dismiss.

**BACKGROUND**

**I.     Factual Background**

The following allegations are taken from the Amended Complaint, which the Court must treat as true for purposes of this motion. This matter arose in connection with Fitbit's marketing of its heart rate tracking devices and its initial public offering ("IPO"). Fitbit manufactures and provides wearable fitness-tracking devices. Dkt. No. 89, Am. Compl. ("AC") ¶ 34. Fitbit's products monitor a user's fitness level by tracking daily activity statistics, including steps taken, distance traveled, calories burned, and stairs climbed. *Id.*

In an October 27, 2014 press release, Fitbit announced its new "proprietary PurePulse$^{TM}$ optical heart rate technology" ("PurePulse"), which claimed to provide "continuous and automatic

wrist-based heart rate tracking, without an uncomfortable chest strap." *Id*. ¶ 46.  The press release announced two new products featuring PurePulse: the Fitbit Charge HR and the Fitbit Surge.  *Id*. ¶ 52.  Fitbit's advertising for the Charge HR and Surge focused heavily on their heart rate and monitoring features, including slogans such as "Every Beat Counts." *Id*. ¶ 60.

On May 7, 2015, Fitbit filed a registration statement in connection with its IPO.  *Id*. ¶ 36.  The final amended registration statement was filed on June 6, 2015.  *Id*.  On or about June 18, 2015, Fitbit completed its IPO.  *Id*. ¶ 39.  The company sold 22,387,500 shares of stock and certain other stockholders (including defendants Park, Friedman, Callaghan, and Murray) collectively sold 19,673,750 shares.  *Id*.  Net proceeds reached approximately $416 million.  *Id*.

On November 2, 2015, Fitbit filed a registration statement in connection with a secondary public offering.  *Id*. ¶ 40.  On or about November 13, 2015, Fitbit completed its secondary offering.  *Id*. ¶ 42.  The company sold 3,000,000 shares and certain other stockholders (including defendants Park, Zerella, Friedman, Callaghan, and Murray) collectively sold 14,000,000 shares.  *Id*.  The company raised net proceeds of approximately $82.7 million.  *Id*.

The Amended Complaint alleges that "[t]he Charge HR and Surge sold very quickly, driving Fitbit's revenues to grow rapidly in 2015." *Id*. ¶ 69.  The IPO Prospectus noted that the Charge HR and Surge were among "the primary drivers of our revenue growth in the first quarter of 2015." *Id*. ¶ 70.  Driven by sales of these products with PurePulse technology, Fitbit's revenues reached $1.858 billion in 2015, compared to $745.4 million in 2014.  *Id*. ¶ 76.  Plaintiffs allege that because the heart rate monitoring was the key feature of Fitbit's most important products, its accuracy was crucial to Fitbit's business success.  *Id*. ¶ 77.

Plaintiffs allege that from January 5, 2016 to May 19, 2016, the truth about the inaccuracy of Fitbit's heart rate tracking devices was revealed in a class action lawsuit and subsequent reporting and in a study on the accuracy of the devices.  *Id*. ¶ 80.  Fitbit's stock fell from a high of $30.96 per share on January 5 to close at $13.99 per share on May 19.  *Id*.

Specifically, on January 5, 2016, a class action lawsuit, *McLellan et al. v. Fitbit, Inc*., 3:16-cv-00036-JD (N.D. Cal. Jan. 5, 2016) was filed in the U.S. District Court for the Northern District of California by purchasers of the Fitbit products, alleging that the heart rate monitoring systems

2

on the Charge HR and Surge were dangerously inaccurate and posed serious health risks to users. *Id*. ¶ 81. The complaint alleged that Fitbit's devices significantly undercounted users' heart rates, particularly during exercise, which created a risk of life-threatening overexertion. *Id*. ¶ 82. On January 5, 2016, Fitbit's stock closed at $24.30 per share, down from a high of $30.96 earlier that day. *Id*. ¶ 85.

After the close of trading on February 22, 2016, Indianapolis television news channel WTHR posted to its website the results of a study that found that the Charge HR had an average heart rate error of 14 percent, which it described as "bordering on dangerous." *Id*. ¶ 93. On February 23, Fitbit's stock price fell 27.9 percent to close at $13.08 per share. *Id*. ¶¶ 93-94.

On May 19, 2016, the Amended Consolidated Master Class Action Complaint was filed in the *McLellan* purchaser class action. *Id*. ¶ 95. According to the Amended Complaint in this case, the amended *McLellan* complaint "contained the results of the most thorough study of Fitbit heart-rate monitors performed to date." *Id*. The study concluded that Fitbit devices "do not accurately measure a user's heart rate, particularly during moderate to high intensity exercise, and cannot be used to provide a meaningful estimate of a user's heart rate." *Id*. ¶ 96. Following this news, Fitbit's stock again fell on May 19, 2016, closing at $13.99. *Id*. ¶ 98.

## II.    Current Matter

Plaintiff Brian Robb filed this securities class action lawsuit on January 11, 2016, in connection with Fitbit's marketing of its heart rate monitoring devices and its initial public offering. Dkt. No. 1. Fitbit Investor Group[1] was appointed lead plaintiff on May 10, 2016. Dkt. No. 73. Plaintiffs filed their Amended Complaint on July 1, 2016, bringing suit against Fitbit, individuals at Fitbit, and underwriters of Fitbit's IPO.[2] Dkt. No. 89.

---

[1] The group consists of investors Timothy Flynn, Jesse M. Koth, Kelley Koth, Viet Tran, and Mark Cunningham.

[2] Plaintiffs assert claims against Fitbit, Inc., James Park, William R. Zerella, Eric N. Friedman, Jonathan D. Callaghan, Steven Murray and Christopher Paisley (collectively "Fitbit defendants"); and Morgan Stanley & Co. LLC, Deutsche Bank Securities Inc., and Merrill Lynch, Pierce, Fenner & Smith Inc. (collectively "Underwriter defendants"). AC ¶¶ 20-26, 29-31.

United States District Court
Northern District of California

1    Plaintiffs allege that "[a]s a result of Defendants' false and misleading statements about the

2    accuracy of Fitbit's heart rate-tracking, Fitbit securities were offered and traded at inflated prices."

3    *Id*. ¶ 99.   Further, plaintiffs allege that after the inaccuracy of Fitbit's heart rate tracking was

4    revealed by the *McLellan* lawsuit, as well as by subsequent reporting and a study of the devices,

5    Fitbit's stock suffered a "precipitous decline," losing 54.8 percent of its market value.  *Id*. ¶¶ 80-

6    81, 99.  Plaintiffs argue that this caused them significant losses and damages.  *Id*. ¶ 99.

7    Plaintiffs bring claims under: (1) the Securities Exchange Act of 1934 (the "Exchange

8    Act"), 15 U.S.C. § 78 et seq., on behalf of a class of all persons who purchased or otherwise

9    acquired Fitbit securities on the open market between June 18, 2015 and May 19, 2016; and (2)

10   the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 et seq, on behalf of a class of all

11   persons who purchased or otherwise acquired Fitbit A common stock pursuant and/or traceable to

12   Fitbit's IPO on or about June 18, 2015.  *Id.* ¶¶ 1-4.

13   Plaintiffs allege violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

14   against defendants Fitbit, Park, Zerella, and Friedman.  *Id*. ¶¶ 3, 38, 198-209.  They allege that

15   these defendants acted knowingly or were deliberately reckless in issuing materially false or

16   misleading statements and/or failing to disclose material facts concerning the inaccuracy of

17   Fitbit's heart rate tracking devices.   Plaintiffs also allege violations of Section 20(a) of the

18   Exchange Act, 15 U.S.C. § 78t(a), against defendants Park, Zerella, and Friedman by virtue of

19   their role as control persons of Fitbit.  *Id*. ¶¶ 3, 210-215.

20   Plaintiffs allege violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, against the

21   Fitbit defendants and the Underwriter defendants.  *Id*. ¶¶ 4, 27, 32-33, 216-225.  They charge that

22   defendants are strictly liable for issuing materially false or misleading statements and/or failing to

23   disclose material facts concerning the inaccuracy of Fitbit's heart rate tracking devices.  Plaintiffs

24   further allege violations of Section 15 of the Securities Act, 15 U.S.C. § 77o, against defendants

25   Park, Zerella, and Friedman in their roles as control persons of Fitbit.  *Id*. ¶¶ 4, 226-229.

26   On July 29, 2016, the Fitbit defendants filed the present motion to dismiss.  Dkt. No. 107.

27

28

United States District Court
Northern District of California

4

United States District Court
Northern District of California

1  The Underwriter defendants filed a motion to dismiss on August 5, 2016, and joined the Fitbit

2  defendants' motion as to the Section 11 claim.  Dkt. No. 110.  On August 25, 2016, the Court

3  granted plaintiffs leave to file a single opposition brief not to exceed 35 pages.  Dkt. No. 112.

**LEGAL STANDARD**

To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to

state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  This "facial plausibility" standard requires the plaintiff to allege facts that add up to

"more than a sheer possibility that a Defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S.

662, 678 (2009).  While courts do not require "heightened fact pleading of specifics," a plaintiff

must allege facts sufficient to "raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555, 570.  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the

elements of a cause of action will not do.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at

555).  "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual

enhancement.' " *Id*. (quoting *Twombly*, 550 U.S. at 557).  "While legal conclusions can provide

the framework of a complaint, they must be supported by factual allegations." *Id*. at 679.

In reviewing a Rule 12(b)(6) motion, a district court must accept as true all facts alleged in

the complaint, and draw all reasonable inferences in favor of the plaintiff. *See al-Kidd v. Ashcroft*,

580 F.3d 949, 956 (9th Cir. 2009).  However, a district court is not required to accept as true

"allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

inferences." *In re Gilead Scis. Sec. Litig*., 536 F.3d 1049, 1055 (9th Cir. 2008).  As a general rule,

the Court may not consider any materials beyond the pleadings when ruling on a Rule 12(b)(6)

motion. *Lee v. City of L.A*., 250 F.3d 668, 688 (9th Cir. 2001).  However, pursuant to Federal

Rule of Evidence 201, the Court may take judicial notice of "matters of public record," such as

prior court proceedings, without thereby transforming the motion into a motion for summary

judgment. *Id*. at 688-89.

If the Court dismisses a complaint, it must decide whether to grant leave to amend.  The

Ninth Circuit has "repeatedly held that a district court should grant leave to amend even if no

1   request to amend the pleading was made, unless it determines that the pleading could not possibly

2   be cured by the allegation of other facts."  *Lopez v. Smith*, 203 F.3d 1122, 1130 (9th Cir. 2000)

3   (citations and internal quotation marks omitted).

4

5                                                    **DISCUSSION**

6   **I.      Exchange Act Claims**

7           Defendants Fitbit, Park, Zerella, and Friedman move to dismiss plaintiffs' Section 10(b)

8   claim against them on the basis that the Amended Complaint fails to adequately allege any

9   actionable misstatements and fails to plead scienter and loss causation.  They also move to dismiss

10  plaintiffs' Section 20(a) claim on the grounds that the complaint fails to adequately allege a

11  primary violation under Section 10(b).

12

13          **A.      Section 10(b)**

14          Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection

15  with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance

16  in contravention of such rules and regulations as the [SEC] may prescribe as necessary."  15

17  U.S.C. § 78j(b).  A plaintiff asserting a claim under Section 10(b) or Rule 10b-5 must adequately

18  allege six elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3)

19  a connection between the misrepresentation or omission and the purchase or sale of a security; (4)

20  reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.  *Kelly*

21  *v. Electronic Arts, Inc.*, 71 F. Supp. 3d 1061, 1068 (N.D. Cal. 2014) (citing *Stoneridge Inv.*

22  *Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *In re NVIDIA Corp. Sec.*

23  *Litig.*, 768 F.3d 1046, 1051-52 (9th Cir. 2014)).

24          The Private Securities Litigation Reform Act of 1995 ("PSLRA") requires that a Section

25  10(b) complaint plead with particularity both falsity and scienter.  *Zucco Partners, LLC v.*

26  *Digimarc Corp.*, 552 F.3d 981, 990-91 (9th Cir. 2009) (citation omitted).  As to falsity, the

27  complaint must state with particularity each statement alleged to have been misleading, the reason

28  or reasons why the statement is misleading, and all facts on which that belief is formed.  15 U.S.C.

United States District Court
Northern District of California

6

§ 78u-4(b)(1); *Daou*, 411 F.3d 1006, 1014 (9th Cir. 2005) (citation omitted).  As to scienter, the complaint must state with particularity facts giving rise to a strong inference that the defendant made false or misleading statements either intentionally or with deliberate recklessness.  15 U.S.C. § 78u-4(b)(2); *Daou*, 411 F.3d at 1015.

Federal Rule of Civil Procedure 9(b) requires a plaintiff who alleges fraud or mistake to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  This requirement extends to securities fraud complaints.  *Zucco Partners*, 552 F.3d at 990 (citing *Semegen v. Weidner*, 780 F.2d 727, 729, 734-35 (9th Cir. 1985)).

### 1. Alleged Misstatements

Defendants Fitbit, Park, Zerella, and Friedman argue that the statements to which plaintiffs point are not false and misleading because none of the statements claim that PurePulse technology is accurate at all times.  Dkt. No. 107, Fitbit Mot. at 15.  They argue that many of the statements are simply inactionable promotional slogans such as "every beat counts," "make every beat count," and "never miss a beat."  *Id.*  They also argue that the post-IPO statements are not false and misleading because no reasonable investor would rely on such promises of perfection.  *Id.* at 16.  Plaintiffs counter that it was entirely reasonable for investors to interpret defendants' statements to mean, at a minimum, that Fitbit devices were consistently accurate, and that Fitbit's public statements implied that its heart rate tracking was at least accurate enough for the consumers' intended use of the devices.  Dkt. No. 115, Opp. at 2.

The Amended Complaint alleges that defendants made a number of materially false or misleading statements about the Charge HR and Surge, including the following statements, which defendants challenge as failing to meet the standard to state a claim under the Exchange Act.

Plaintiffs allege that defendants' pre-IPO statements in the October 2014 and January 2015 press releases misled readers into believing that the devices could track every beat of a wearer's heart, when in fact Fitbit's devices were often highly inaccurate.  AC ¶¶ 129, 134.  Plaintiffs state that the October 2014 press release, "under the heading 'Every Beat Counts with Fitbit Charge HR,' described the Charge HR as 'an advanced tracker that delivers continuous, automatic wrist-

based heart rate.'" *Id*. ¶ 129.  The press release also stated that the device "applies Fitbit's finely tuned algorithms to deliver heart rate tracking 24/7." *Id*.  The press release described the Surge device as providing "continuous wrist-based heart rate, all-day fitness tracking and smartwatch functionality in one device, for people dedicated to reaching their peak performance," with the "most advanced tracking . . . on the market" and "comprehensive [workout] summaries with tailored metrics, workout intensity based on heart rate and calories burned." *Id*. ¶ 132.

The January 2015 press release described Fitbit's PurePulse technology as "superior heart rate tracking" that is "continuous and automatic so the technology works no matter what you're doing." *Id.* ¶ 134.  It described the Charge HR and Surge as follows:

> Superior heart rate tracking technology.  Fitbit Charge HR and Fitbit Surge don't just track resting heart rate—they both offer continuous, automatic heart rate tracking all day, all night and during workouts so you never miss a beat.  PurePulse heart rate tracking provides more accurate calorie burn, the ability to maintain your workout intensity, maximize your training and optimize your all day health and fitness.

*Id.*

Plaintiffs further allege that statements by defendant Park in a March 19, 2015 interview in *Time* Magazine and in a subsequent March 27, 2015 interview in the *Washington Post* created a misleading impression that Fitbit Surge was capable of accurately measuring a wearer's heart rate. *Id.* ¶ 139.  They allege that Park stated in *Time,* "I think there'll be a next big leap in benefits once we tie into more detailed clinical research and cross the hurdles and dialogue with the FDA about what we can do for consumers and what's regulated or not." *Id.* ¶ 137.  The article also stated, "Park says that consumer-oriented wearable technology produced by companies like Fitbit could further help customers in the coming few years by making sense of data and making 'lightweight' medical diagnoses." *Id.* ¶ 138.  In the *Washington Post* article, defendant Park is quoted as stating that PurePulse was "the result of three years of R&D effort by our team." *Id.* ¶ 139.  The article also stated that Park's "heart rate was 69 beats per minute when we wrapped up our conversation, according to the Fitbit Surge he was wearing.  (That was up slightly from his resting heart rate, 60 beats per minute)." *Id.*  Plaintiffs allege this last statement "creates a misleading impression that Fitbit Surge is capable of accurately measuring a wearer's heart rate to the point that a 9 beat per

minute difference in readings is meaningful." *Id.*

The IPO Prospectus Summary, stated, in part: "We dedicate significant resources to developing proprietary sensors, algorithms, and software to ensure that our products have highly accurate measurements, insightful analytics, compact sizes, durability, and long battery lives." *Id.* ¶ 112.  The Prospectus also claimed, "[o]ur devices . . . feature proprietary and advanced sensor technologies and algorithms as well as high accuracy and long battery life." *Id.* ¶ 114.  The Prospectus claimed to enable its users "to automatically and continuously track their heart rate during everyday activity and exercise." *Id.* ¶ 115.

Plaintiffs allege that, following the June 18, 2015 IPO, defendants continued to make materially false or misleading statements.  In an interview published on June 25, 2015, plaintiffs quote defendant Park as giving the following exchange:

[Q]: Will anyone in wrist-wearables get optical heart rate sensors right?

[Park]: That's implying that they're all wrong today, which I disagree with.  With any technology there's always a tradeoff.  In some cases, there's accuracy in certain situations.

[Q]: Are you pleased with the optical HR tracking on the Surge?

[Park]: I wear it 24/7 so I'm happy with it.

[Q]: But not everyone is.

[Park]: Look, there are tradeoffs . . . With research and advancements in technology, there are always going to be major advancements in accuracy, battery life and form factor.

*Id.* ¶ 141.

Plaintiffs allege that statements made by defendant Park in an August 5, 2015 earnings call falsely implied that PurePulse technology was "ready" for the purposes for which Fitbit advertised the Charge HR and Surge, when in fact, Fitbit's heart rate tracking devices were frequently inaccurate and were particularly inaccurate during high-intensity activities.  *Id.* ¶ 143.  This included statements by Park that "the PurePulse technology in Charge HR and Surge took many, many years to develop and perfect.  The key thing for us is we will only launch products when we feel that they're ready." *Id.* ¶ 142.

Plaintiffs allege that the Secondary Offering Prospectus, filed on November 13, 2015, was

United States District Court
Northern District of California

materially false and misleading because it said that Fitbit's heart rate tracking devices had "highly accurate measurements" at all times, when in fact the devices were frequently inaccurate, particularly during high intensity activities. *Id.* ¶ 144. According to the Amended Complaint, the Secondary Prospectus "repeated verbatim each of the IPO Prospectus's . . . false and misleading statements about the accuracy of Fitbit's heart-rate monitoring, and about the ability of Fitbit devices to track heart rates during high intensity activities" that plaintiffs cited. *Id.* ¶ 145.

Lastly, plaintiffs allege that statements in a November 23, 2015 press release after the Secondary Offering were materially false and misleading. *Id.* ¶ 148. These included statements that "Fitbit's proprietary PurePulse heart rate technology has been updated to provide users with an even better heart rate tracking experience during and after high intensity workouts like boot camp and Zumba." *Id.* ¶ 147. The press release also stated that "Fitbit is dedicated to developing the most consistently accurate wrist-based activity trackers on the market. This software update improves upon an already positive heart rate tracking offering." *Id.*

## 2.  Actionable Misstatements

The Court determines that plaintiffs have alleged misstatements in the Amended Complaint which are actionable under securities law.

The Ninth Circuit has defined the point at which a projection of optimism becomes an actionable, "factual" misstatement under section 10(b), namely, when: "(1) the statement is not actually believed, (2) there is no reasonable basis for the belief, or (3) the speaker is aware of undisclosed facts tending seriously to undermine the statement's accuracy." *Kaplan v. Rose*, 49 F.3d 1363, 1375 (9th Cir. 1994) (citations omitted). By contrast, statements that merely express confidence in a company's business and outlook are vague assertions of corporate optimism and are not actionable under federal securities laws. *City of Royal Oak Ret. Sys. v. Juniper Networks, Inc.*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) (citing *Wozniak v. Align Tech., Inc.*, 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012)).

Here, plaintiffs have alleged factual misstatements made by Fitbit both before and after the IPO and in the IPO Prospectus. For example, plaintiffs point to the October 2014 and January

2015 press releases, which claimed that the Charge HR and Surge devices "deliver[] continuous, automatic wrist-based heart rate," "deliver heart rate tracking 24/7," provide "continuous wrist-based heart rate," and provide "continuous, automatic heart rate tracking all day, all night and during workouts . . . ." *See* AC ¶¶ 129, 132, 134.   The Amended Complaint alleges that statements in the IPO Prospectus regarding the devices' accuracy and suitability for high intensity activity were materially false and misleading because Fitbit's heart rate tracking devices were frequently inaccurate and were particularly inaccurate during exercise. *Id.* ¶ 116.   The Prospectus claimed that Fitbit devices "have highly accurate measurements," have "high accuracy," and "automatically and continuously track [users'] heart rate during everyday activity and exercise." *See id.* ¶¶ 112-115.   Plaintiffs allege that Fitbit made similar statements following the IPO, when the Secondary Offering Prospectus continued to describe Fitbit devices as having "highly accurate measurements" at all times. *See id.* ¶ 144.

Plaintiffs also point to *Brickman v. Fitbit, Inc.*, a consumer action in which the court held that Fitbit's use of certain promotional language concerning its devices' sleep tracking functionality was not inactionable puffery and could thus support fraud allegations at the motion to dismiss phase.   No. 15-cv-02077-JD, 2016 WL 3844327, at *3 (N.D. Cal. July 15, 2016); *see also* Opp. at 17.   In that case, the court noted, "[A]dvertising which merely states in general terms that one product is superior is not actionable" but "misdescriptions of specific or absolute characteristics of a product are actionable." *Id.* (citing *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242, 246 (9th Cir. 1990)).   Plaintiffs there alleged that Fitbit represented that its product could "track sleep" when in fact it could only "measure movement and cannot track sleep." *Id.* at *2.   Likewise here, plaintiffs have alleged that Fitbit claims that its devices could "automatically and continuously track their heart rate during everyday activity and exercise" when in fact the devices could not. *See, e.g.,* AC ¶ 151.

It is true, of course, that "vague, generalized assertions of corporate optimism or statements of 'mere puffing' are not actionable material misrepresentations under federal securities laws because no reasonable investor would rely on such statements." *Royal Oak*, 880 F. Supp. 2d at 1063 (citing *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 1083, 1096 (C.D. Cal.

2008)) (internal quotation marks omitted). Plaintiffs do assert some statements which, in isolation, would be non-actionable under these standards. For instance, statements by defendant Park in which he muses that "there'll be a next big leap in benefits once we tie into more detailed clinical research" or in which he states that he wears his Surge device "24/7" and is "happy with it" are statements of opinion and corporate optimism upon which no reasonable investor would rely.[3] *See* AC ¶¶ 137, 141.

Defendants also attack the complaint as failing to plead facts demonstrating the falsity of Fitbit's statements, arguing that the customer complaints, studies, and confidential witness statements in the Amended Complaint do not suffice to prove that Fitbit's devices could not do what they claimed to do. Fitbit Mot. at 11. However, the Court finds defendants' supporting authority to be distinguishable. This is not a case in which the plaintiffs rely on "customer complaints . . . on their own [to] establish the veracity of the allegations . . . ." *See Curry v. Yelp, Inc.*, No. 14-3547-JST, 2015 WL 1849037, at *8 (N.D. Cal. Apr. 21, 2015) (citing *In re Netflix, Inc. Sec. Litig.*, No. 04-2978-FMS, at *7 (N.D Cal. June 28, 2005)). Nor is this a case in which the Court is left to speculate whether Fitbit's product was "highly accurate compared to what?" as Judge Breyer was left to wonder in *In re Siebel Sys., Inc. Sec. Litig.*, No. 04-0983-CRB, 2005 WL 3555718, at *3 (N.D. Cal. Dec. 28, 2005). In that case, the court found that just because "some customers were having problems using the [sales forecasting] program because it was too slow or took too many steps does not make the program a 'highly inaccurate' forecasting tool." *See Siebel*, 2005 WL 3555718, at *3. Here, by contrast, plaintiffs have alleged not that users have difficulty using the product but that the product itself does not do the thing that it claims to do, i.e., "automatically and continuously track their heart rate during everyday activity and exercise." *See* AC ¶ 151.

In sum, plaintiffs have pointed to numerous statements in which Fitbit claimed that its

_____

[3] Nor is it clear that all of the alleged misstatements are in fact statements made by a defendant. For instance, the "statement" cited from the March 27, 2015 interview with defendant Park appears not to have been a statement that Park himself made but an observation made by the article's author. *See* AC ¶ 139 ("His heart rate was 69 beats per minute when we wrapped up our conversation, according to the Fitbit Surge he was wearing. (That was up slightly from his resting heart rate, 60 beats per minute).")

devices were able to track heart rates and could do so with a high degree of accuracy.  Relying on multiple and varying sources, plaintiffs allege that the devices could not do this.  Whether the statements were in fact false is not appropriate for resolution on a motion to dismiss.  At this stage, plaintiffs have sufficiently alleged a material misrepresentation or omission by the defendant.

### 3.    Scienter

Defendants also challenge the Amended Complaint as failing to sufficiently plead scienter. "To adequately plead scienter, the complaint must . . . 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.' " *Zucco Partners*, 552 F.3d at 991 (citing 15 U.S.C. § 78u-4(b)(2)).  "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Tellabs, Inc. v. Makor Issues & Rights, Inc*., 551 U.S. 308, 324 (2007).  "To adequately demonstrate that the defendant acted with the required state of mind, a complaint must allege that the defendants made false or misleading statements either intentionally or with deliberate recklessness." *Zucco Partners*, 552 F.3d at 991 (internal quotation marks and citation omitted).

The Supreme Court has explained that the inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23.  The Ninth Circuit has instructed that "following *Tellabs*, we will conduct a dual inquiry: first, we will determine whether any of the plaintiff's allegations, standing alone, are sufficient to create a strong inference of scienter; second, if no individual allegations are sufficient, we will conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id*. at 992.

### a.    Incentive to Inflate the Company's Prospects

Plaintiffs argue that in preparation for its IPO, Fitbit's management had an incentive to inflate the company's prospects to investors by failing to disclose that its PurePulse heart rate

1     monitoring technology was highly inaccurate, particularly during the very intense physical

2     activities for which Fitbit expressly marketed it.  AC ¶ 157.  Plaintiffs emphasize that the Charge

3     HR and Surge were key revenue drivers for the company and that, together with another Fitbit

4     device, they provided the company with 80 percent of its 2015 revenue.  *Id.* ¶ 152.

5          Post-*Tellabs*, the Ninth Circuit has found that "[f]acts showing mere recklessness or a

6     motive to commit fraud and opportunity to do so provide some reasonable inference of intent, but

7     are not independently sufficient."  *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (citing *In re*

8     *Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 979 (9th Cir. 1999), *abrogated on other grounds*

9     *by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008)).  Rather, "to show a strong

10    inference of deliberate recklessness, plaintiffs must state facts that come closer to demonstrating

11    intent, as opposed to mere motive and opportunity."  *Silicon Graphics*, 542 F.3d at 974.

12    Accordingly, "particular facts giving rise to a strong inference of deliberate recklessness, at a

13    minimum" is required to satisfy the PSLRA's heightened pleading standard.  *Id.*

14         Here, plaintiffs' allegations, if true, provide a powerful incentive.  However, without

15    providing additional facts that go beyond demonstrating "mere motive and opportunity,"

16    plaintiff's allegations would fail adequately to plead intent or deliberate recklessness.  Therefore,

17    while the allegations regarding incentive may be relevant to a holistic inquiry into scienter, *see*

18    below, the allegations in isolation fail to meet the heightened pleading standard under the PSLRA.

19

20              **b.     Individual Defendants' Personal Use of Devices**

21         Plaintiffs allege that defendants Park, Zerella, and Friedman knew of the limited accuracy

22    of Fitbit's heart rate monitoring devices through their own personal use of these devices.  AC

23    ¶ 160.  Plaintiffs specifically point to statements by Park that "[w]ith any technology there's

24    always a tradeoff" and that "there's accuracy in certain situations" to suggest that he understood

25    the limited accuracy of Fitbit's heart rate monitoring devices.  *See id.* ¶ 161.

26         Defendants' personal use of the devices, standing alone, cannot prove scienter.  "[T]he

27    inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent

28    and compelling, thus strong in light of other explanations."  *Tellabs*, 551 U.S. at 324.  Though

United States District Court
Northern District of California

1  defendants may have used the devices to track their own heart rates, there is no indication that they

2  had any metric against which to compare these measurements in order to determine their accuracy.

3  Their mere use of the devices thus fails to establish defendants' knowledge of inaccuracy and,

4  taken individually, does not prove scienter.

5

6                                        c.        **Stock Sales**

7              Plaintiffs allege that in a conference call with Fitbit investors and stock market analysts on

8  November 2, 2015, Park stated, "Based on the Company's execution in the third quarter, I've

9  never been more confident in Fitbit's future" and that less than two weeks later, Park sold 11

10 percent of his Fitbit stock in the company's secondary offering.  AC ¶ 162.

11             "Although 'unusual' or 'suspicious' stock sales by corporate insiders may constitute

12 circumstantial evidence of scienter, . . . insider trading is suspicious only when it is 'dramatically

13 out of line with prior trading practices at times calculated to maximize the personal benefit from

14 undisclosed inside information.'"  *Silicon Graphics*, 183 F.3d at 986 (citing *In re Apple Computer*

15 *Sec. Litig.*, 886 F.2d 1109, 1117 (9th Cir. 1989)).  Three factors that must be considered in

16 determining whether stock sales raise a strong inference of deliberate recklessness are: "(1) the

17 amount and percentage of shares sold by insiders; (2) the timing of the sales; and (3) whether the

18 sales were consistent with the insider's prior trading history."  *Id*.  For individual defendants' stock

19 sales to raise an inference of scienter, standing alone, plaintiffs must also provide a "meaningful

20 trading history" for purposes of comparison to the stock sales within the class period.  *See In re*

21 *Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1095-96 (9th Cir. 2002), *abrogated on other grounds by*

22 *S. Ferry LP,* 542 F.3d at 784.

23             Here, plaintiffs do not provide any trading history for Park for purposes of comparison to

24 other stock sales within the Exchange class period.[4]  Allegations that Park sold 11 percent of his

25

26            [4] Plaintiffs also argue in their opposition brief that defendants Friedman and Zerella "sold a
   substantial amount of stock in the IPO."  Opp. at 27.  They offer to amend their complaint in order
27 to raise these allegations.  *Id.* at 27 n.15.  The Court finds that such amendment is unnecessary, in
   light of the Court's ultimate ruling, explained below, that plaintiffs have sufficiently alleged
28 scienter at this stage.

1  Fitbit stock during the secondary offering, without more, does not establish scienter.

2

3                    **d.        Confidential Witness Statements**

4          Lastly, plaintiffs argue that statements from three confidential witnesses ("CW")

5  demonstrate that Fitbit executives were aware of the inaccuracy of the PurePulse devices.

6          Complaints relying on confidential witness statements to establish scienter must pass two

7  hurdles to satisfy the pleading requirements under the PSLRA. First, the confidential witnesses

8  must be described with sufficient particularity to establish their reliability and personal

9  knowledge. *Zucco Partners*, 552 F.3d at 995 (citing *Daou*, 411 F.3d at 1015-16). This means the

10 complaint must provide sufficient detail about a confidential witness's position within the

11 defendant company to provide a basis for attributing the facts reported by them to the witness's

12 personal knowledge. *Id.* Second, those statements which are reported by confidential witnesses

13 with sufficient reliability and personal knowledge must themselves be indicative of scienter. *Id.*

14         Here, statements by CW 1 and CW 2 are sufficient to establish scienter. According to the

15 Amended Complaint, CW 1 was a data scientist who was a paid contractor and consultant at Fitbit

16 from November 2014 to December 2015 and who was hired specifically to develop quality-

17 assurance analytics for the Charge HR, Surge, and other devices. AC ¶ 164. CW 1 presented

18 Fitbit Chief Operations Officer Hansgregory "Hans" C. Hartmann with monthly reports that

19 documented and ranked various types of customer complaints and device failures. *Id.* ¶ 166. By

20 June or July 2015, these monthly reports "noted significant issues with the accuracy of Fitbit's

21 heart-rate monitoring, relative to other types of failures." *Id.* ¶ 167. CW 1 also noted that "Fitbit's

22 quality-assurance program consisted largely of a group of athletes who exercised while wearing

23 Fitbit devices and then recorded the results," that the Fitbit office had a dedicated area for this

24 athlete testing, that in June and July 2015 the Fitbit employees who worked with this data "were

25 focused entirely on testing and understanding the inaccuracies in Fitbit's heart-rate monitoring,

26 rather than on other issues," and that defendant Park frequently visited the athlete testing area. *Id.*

27 ¶¶171-74.

28         Similarly, CW 2 was a contract fitness tester at Fitbit from April 2015 until July 2015. *Id.*

United States District Court
Northern District of California

¶ 175.  CW 2 managed and supervised a team of eight to ten fitness testers as they performed various exercises while wearing Fitbit devices and managed the logging of their heart rate results. *Id*. ¶ 177.  CW 2 ultimately reported to Fitbit Chief Operating Officer Hartmann.  *Id*.  The Amended Complaint alleges that CW 2 "found Fitbit's heart-rate monitoring devices to be highly inaccurate, particularly during vigorous exercise" and that CW2 "reported that the results were often inaccurate for users with either very light or very dark skin tones." *Id.* ¶179.

In addressing the first prong of the CW analysis, both CW 1 and CW 2 held positions that exposed them directly to data and consumer complaints on the Charge HR and Surge, establishing their reliability and personal knowledge of the alleged inaccuracies.  Second, both CW 1 and CW 2 reported directly to COO Hartmann, indicating scienter by Fitbit executives.  These confidential witness statements suffice to plead scienter.

However, statements by CW 3, standing alone, fail to establish scienter.  CW 3 was an executive assistant at Fitbit from January to July 2015.  *Id*. ¶ 180.  According to CW 3, because the athlete testing area was adjacent to a dining area, Fitbit employees were widely familiar with the testing area as well as with the underlying problems with the accuracy of Fitbit's heart rate monitoring, and that defendant Zerella in particular was well aware of the testing area.  *Id*. ¶¶ 180-81.  The Court finds these allegations regarding scienter to be conclusory and that CW 3's statements fail to plead scienter.

### e.  Holistic Review

In addition to the statements by CW 1 and CW 2, the above allegations, taken holistically per *Tellabs*, also establish scienter.  Where none of a complaint's allegations of scienter are individually cogent or compelling enough to survive under the PSLRA, courts must also "consider the complaint in its entirety" to determine whether "all of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs*, 511 U.S. 322-23.  "*Tellabs* permits a series of less precise allegations to be read together to meet the PSLRA requirement." *S. Ferry LP*, 542 F.3d at 784.  When conducting this holistic review, courts must "take into account plausible opposing inferences" that could weigh against a finding of scienter. *Tellabs*, 511 U.S. 323.  "Even if a set of

United States District Court
Northern District of California

allegations may create an inference of scienter greater than the sum of its parts, it must still be at least as compelling as an alternative innocent explanation." *Zucco Partners*, 552 F.3d at 1006.

Taken together, the allegations in this case are at least as cogent or compelling as a plausible alternative inference, namely that Fitbit executives were simply unaware of the high degree of inaccuracy in PurePulse devices alleged. Particularly given the contributions these devices made to Fitbit's revenue stream in 2015, and the allegations by CW 1 and CW 2, the Court finds that a holistic review of the allegations suffices to establish scienter.

### 4. Loss Causation

Lastly, defendants argue that plaintiffs' Section 10(b) claim should be dismissed for failure to plead loss causation because the complaints in the *McLellan* consumer lawsuit and the local news report on Fitbit's heart rate tracking did not reveal to the market that Fitbit's challenged statements were false or misleading. Fitbit Mot. at 23. Defendants argue that at most these events revealed the *potential* that a misstatement existed, which they argue is insufficient under Ninth Circuit law. *Id.*

"[T]o prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Daou*, 411 F.3d at 1025 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 346 (2005)). "A complaint fails to allege loss causation if it does not 'provide[ ] [a defendant] with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation.'" *Metzler Inv. GMBH v. Corinthian Colls., Inc*., 540 F.3d 1049, 1062 (9th Cir. 2008) (quoting *Dura*, 544 U.S. at 347). A plaintiff must only allege "facts that, if taken as true, plausibly establish loss causation." *In re Gilead Scis. Litig*., 536 F.3d at 1057.

The Amended Complaint alleges, "Over the course of January 5, 2016 to May 19, 2016, the truth about the inaccuracy of Fitbit's heart-rate tracking devices was revealed in a lawsuit, subsequent reporting, and finally a comprehensive study of Fitbit devices' heart-rate tracking accuracy" and that as a result, "Fitbit's stock price fell from a high of $30.96 on January 5 to close

18

United States District Court
Northern District of California

at $13.99 on May 19," an overall loss of 54.8 percent in value.  AC ¶ 13.  Whether the stock drop was due to other factors is a factual inquiry better suited for determination on summary judgment or trial, rather than at the pleading stage.  *See McCabe v. Ernst & Young, LLP*, 494 F.3d 418, 427 n.4 (3d Cir. 2007); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc*., 343 F.3d 189, 197 (2d Cir. 2003).  Accordingly, the Court finds that as a pleading matter, plaintiffs have sufficiently alleged loss causation.  The Court therefore DENIES the motion to dismiss plaintiffs' Section 10(b) claim.

### B.      Section 20(a)

Plaintiffs also allege Section 20(a) claims against defendants Park, Zerella, and Friedman on a "control person" theory of liability.  Section 20(a) of the Exchange Act imposes liability on "control persons."  15 U.S.C. § 78t(a).  To establish liability under Section 20(a), a plaintiff must first prove a primary violation of Section 10(b) or Rule 10b-5.  *Lipton v. Pathogenesis Corp*., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).

As plaintiffs have adequately alleged a primary violation under Section 10(b), defendants' motion to dismiss plaintiffs' claim for control person liability under Section 20 is DENIED.

## II.     Securities Act Claims

Plaintiffs also allege claims under Sections 11 and 15 of the Securities Act.  AC ¶ 217.  All defendants—Fitbit defendants and Underwriter defendants—challenge plaintiffs' Section 11 claims, arguing that: (1) plaintiffs do not allege that the IPO Registration Statement contained any materially false or misleading statements and (2) plaintiffs do not allege any recoverable damages. Fitbit Mot. at 7-8; Dkt. No. 110, Underwriter Mot. at 1-2.

### A.      Section 11

Section 11 of the Securities Act of 1933 imposes liability on issuers, underwriters, and other participants in a public securities offering for any material misstatement of fact or material omission in the registration statement.  15 U.S.C. § 77k.  Section 11(a) provides that where a

material fact is misstated or omitted from a registration statement accompanying a stock filing with the SEC, "any person acquiring such security" may bring an action for losses caused by the misstatement or omission. *Id.* § 77k(a).  As with Section 10(b) of the Exchange Act, Section 11 of the Securities Act "require[s] a plaintiff adequately to allege a material misrepresentation or omission." *In re Stac Electronics Secs. Litig.*, 89 F.3d 1399, 1403 (9th Cir. 1996) (citation, internal quotation marks, and alteration omitted).  "The plaintiff in a § 11 claim must demonstrate (1) that the registration statement contained an omission or misrepresentation, and (2) that the omission or misrepresentation was material, that is, it would have misled a reasonable investor about the nature of his or her investment." *Id.* (citing *Kaplan*, 49 F.3d at 1371).

### 1.     Actionable Misstatements

The Court's above discussion of plaintiffs' allegations of false and misleading statements under Section 10(b) of the Exchange Act applies equally to the Section 11 Securities Act claims, specifically to statements in the IPO Prospectus.  The allegedly false and misleading IPO statements for the Section 11 claim are included among those alleged in plaintiffs' Section 10(b) claims.

Nor do any risk disclosures in the Registration Statement negate this finding, as the Underwriter defendants argue.  *See* Underwriter Mot. at 4; Dkt. No. 108, Keats Decl. Ex. A.[5] Defendants cite to a portion of the Prospectus that states:

> Furthermore, our products are used to track and display various information about users' activities, such as daily steps taken, calories burned, distance traveled, floors climbed, active minutes, sleep duration and quality, and heart rate and GPS-based information such as speed, distance, and exercise routes.  **In the past,** there have been reports and claims made against us alleging that our products do not provide accurate measurements and data to users, including claims asserting that certain features of our products do not operate as advertised.  Such reports and claims have resulted in negative publicity, and, in some cases, have required us to expend time and resources to defend litigation.  **If** our products fail to provide accurate measurements and data to users, or if there are reports or claims of inaccurate

---

[5] Plaintiffs do not object to Fitbit defendants' request for judicial notice of Exhibits A-V attached to the Declaration of Ryan M. Keats.  *See* Dkt. Nos. 108, 109.  "In a securities fraud action, the court may take judicial notice of public records outside the pleadings, including SEC filings." *In re Nuko Info. Sys., Inc. Sec. Litig.*, 199 F.R.D. 338, 341 (N.D. Cal. 2000) (citation omitted).  Accordingly, the Court takes judicial notice of Exhibits A-V.

measurements or claims regarding the overall health benefits of our products and services in the future, we may become the subject of negative publicity, litigation, including class action litigation, regulatory proceedings, and warranty claims, and our brand, operating results, and business could be harmed.

Keats Decl. Ex. A at 20 (emphases added); Fitbit Mot. at 4; Underwriter Mot. at 4.  This statement does not suffice to "render it implausible that any reasonable investor would have been misled" regarding the accuracy of Fitbit's heart rate tracking devices.  *See* Underwriter Mot. at 4.  The statement does not disclose that there were presently, at the time of the IPO, indications that Fitbit's heart rate monitoring technology was inaccurate, as the Amended Complaint alleges.  It states only that "in the past" such claims generally had been made regarding "certain features of our products" and that "if" in the future the "products fail to provide accurate measurements" then Fitbit's business "could be harmed."  *See* Keats Decl. Ex. A at 20.

The Court therefore finds that, as with the Section 10(b) allegations, the Amended Complaint sufficiently states actionable misrepresentations under Section 11 at this time.

### 2.    Loss Causation/Recoverable Damages

Defendants also move to dismiss plaintiffs' Section 11 claim based on an argument that plaintiffs have not adequately alleged that their damages were caused by the alleged misstatements.  Fitbit Mot. at 13; Underwriter Mot. at 8.  They argue that, although it is the defendants' burden to prove the affirmative defense of negative causation, the Amended Complaint shows that plaintiffs are not entitled to damages because they allege only one corrective disclosure prior to the filing of their lawsuit, and that the stock price remained above the initial offering price several days after that disclosure.  Fitbit Mot. at 13; Underwriter Mot. at 8.  Plaintiffs counter that defendants have not met their burden of proving negative causation and that in any event the Amended Complaint alleges that Fitbit stock traded below the initial offering price when plaintiffs filed this lawsuit on January 11, 2016.  Opp. at 18-19.

Section 11 allows plaintiffs to recover damages "as shall represent the difference between the amount paid for the security (not exceeding the price at which the security was offered to the public) and . . . the value thereof as of the time such suit was brought . . . ."  15 U.S.C. § 77k(e).

United States District Court
Northern District of California

The statute also provides, however, that "if the defendant proves that any portion or all of such damages represents other than the depreciation in value of such security resulting from such part of the registration statement, with respect to which his liability is asserted, . . . such portion of or all such damages shall not be recoverable." *Id.*

"The defendant has the burden of proof on this defense[,]" and courts have characterized the burden as a "heavy" one. *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1422 (9th Cir. 1994). A "defendant must show that the depreciation in value of a plaintiff's stock resulted from factors other than the alleged material misstatement." *Hildes v. Arthur Andersen LLP*, 734 F.3d 854, 860 (9th Cir. 2013) (internal quotation marks omitted). A plaintiff is not required to plead loss causation in the complaint, and courts generally will not decide this issue at the motion to dismiss phase unless, "the facts as alleged by plaintiffs, and documents which the court may take judicial notice of, establish the . . . defense as a matter of law . . . ." *In re Velti PLC Sec. Litig.*, No. 13-3889-WHO, 2015 WL 5736589, at *27 (N.D. Cal. Oct. 1, 2015); *In re Shoretel, Inc. Sec. Litig.*, No. 08-0271-CRB, 2009 WL 248326, at *4-5 (N.D. Cal. Feb. 2, 2009). "Overcoming a negative causation defense requires merely that 'the misrepresentation touches upon the reasons for an investment's decline in value.'" *Hildes*, 734 F.3d at 860 (quoting *In re Worlds of Wonder*, 35 F.3d at 1422).

The Court is not convinced by defendants' arguments that this issue is appropriate for resolution at this stage. Plaintiffs have sufficiently alleged that Fitbit's "misrepresentation touches upon the reasons for an investment's decline in value." *See Hildes*, 734 F.3d at 860. Plaintiffs allege that the filing of the *McLellan* consumer lawsuit on January 5, 2016, caused Fitbit stock prices to decline on that day and on the following days, through January 11, 2016, the date the original complaint in this case was filed. *See* AC ¶¶ 85-91, 197. They further allege that on January 11, 2016, "Fitbit's stock traded at a low price of $18.35 per share and closed at $18.85 per share[,]" down from the IPO price of $20.00 per share. *Id.* ¶ 225.

The Court is not persuaded that the cases defendants cite weigh in favor of dismissing plaintiffs' Section 11 claims. For instance, *In re Shoretel* involved an allegation of a corrective disclosure in the form of a press release; however, the press release did not contain the

misstatements that plaintiffs had alleged, thereby entitling defendant to dismissal of the claim as a matter of law. *Shoretel*, 2009 WL 248326, at \*5. The court in that case contrasted the facts to the situation in *In re Daou*, in which the Ninth Circuit reversed the dismissal of a complaint that "adequately alleged loss causation because the complaint alleged that the market had reacted to disclosure of the misstatements (improper revenue recognition) 'as opposed to merely reacting to reports of the defendant's poor financial health generally.'" *Id.* (citing *Daou*, 411 F.3d at 1026) (quoting *Metzler*, 540 F.3d at 1063). This case more closely mirrors *Daou* than *Shoretel*, as plaintiffs have alleged that the market reacted to the filing of the *McLellan* consumer lawsuit, which revealed the alleged misstatements regarding heart rate tracking accuracy.

Accordingly, defendants' motions to dismiss plaintiffs' Section 11 claim is DENIED.

**B.    Section 15**

Finally, plaintiffs allege Section 15 claims against defendants Park, Zerella, and Friedman on a "control person" theory of liability. *See* AC ¶¶ 228-229. As plaintiffs adequately alleged a primary violation under Section 11 of the Securities Act, defendants' motion to dismiss the claim for control person liability under Section 15 is DENIED.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby DENIES defendants' motions to dismiss.

**IT IS SO ORDERED**.

Dated:  October 26, 2016

_____
SUSAN ILLSTON
United States District Judge