UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN H. ROBB, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>FITBIT INC., et al.,<br><br>　　　　Defendants. | Case No. 16-cv-00151-SI<br><br>**ORDER DENYING MOTION FOR PARTIAL RECONSIDERATION**<br><br>Re: Dkt. No. 143 |

Now before the Court is the motion by defendants Fitbit Inc., James Park, William R. Zerella, and Eric N. Friedman for partial reconsideration of the Court's October 26, 2016 Order denying defendants' motions to dismiss in this proposed securities class action. Dkt. No. 143. Under Civil Local Rule 7-1(b), the Court finds this matter appropriate for resolution without oral argument and VACATES the hearing set for January 20, 2017. For the reasons stated below, the Court DENIES the motion for partial reconsideration.

**BACKGROUND**

The facts and procedural history of this case are stated at length in the Court's October 26, 2016 Order. *See* Dkt. No. 122. Briefly, plaintiffs brought this case in connection with Fitbit Inc.'s marketing of its heart rate tracking devices. Fitbit Inc. ("Fitbit") manufactures and provides wearable fitness tracking devices. Dkt. No. 89, Am. Compl. ("AC") ¶ 34. Fitbit's products monitor a user's fitness level by tracking daily activity statistics, including steps taken, distance traveled, calories burned, and stairs climbed. *Id*.

In an October 27, 2014 press release, Fitbit announced its new "proprietary PurePulse™ optical heart rate technology" ("PurePulse"), which claimed to provide "continuous and automatic

wrist-based heart rate tracking, without an uncomfortable chest strap." *Id*. ¶ 46. The press release announced two new products featuring PurePulse: the Fitbit Charge HR and the Fitbit Surge. *Id*. ¶ 52. Fitbit's advertising for the Charge HR and Surge focused heavily on their heart rate and monitoring features, including slogans such as "Every Beat Counts." *Id*. ¶ 60.

On May 7, 2015, Fitbit filed a registration statement in connection with its initial public offering ("IPO"). *Id*. ¶ 36. The final amended registration statement was filed on June 6, 2015. *Id*. On or about June 18, 2015, Fitbit completed its IPO. *Id*. ¶ 39. On November 2, 2015, Fitbit filed a registration statement in connection with a secondary public offering. *Id*. ¶ 40. On or about November 13, 2015, Fitbit completed its secondary offering. *Id*. ¶ 42.

The Amended Complaint alleges that "[t]he Charge HR and Surge sold very quickly, driving Fitbit's revenues to grow rapidly in 2015." *Id*. ¶ 69. The IPO Prospectus noted that the Charge HR and Surge were among "the primary drivers of our revenue growth in the first quarter of 2015." *Id*. ¶ 70. Driven by sales of these products with PurePulse technology, Fitbit's revenues reached $1.858 billion in 2015, compared to $745.4 million in 2014. *Id*. ¶ 76. Plaintiffs allege that because the heart rate monitoring was the key feature of Fitbit's most important products, its accuracy was crucial to Fitbit's business success. *Id*. ¶ 77.

Plaintiffs allege that from January 5, 2016 to May 19, 2016, the truth about the inaccuracy of Fitbit's heart rate tracking devices was revealed in a class action lawsuit[1] and subsequent reporting and in a study on the accuracy of the devices. *Id*. ¶ 80. Fitbit's stock fell from a high of $30.96 per share on January 5 to close at $13.99 per share on May 19. *Id*.

Plaintiff Brian Robb filed this securities class action lawsuit on January 11, 2016. Dkt. No. 1. Fitbit Investor Group was appointed lead plaintiff on May 10, 2016. Dkt. No. 73. Plaintiffs filed their Amended Complaint on July 1, 2016, bringing suit against Fitbit, individuals at Fitbit, and underwriters of Fitbit's IPO. Dkt. No. 89.

Plaintiffs allege that "[a]s a result of Defendants' false and misleading statements about the accuracy of Fitbit's heart rate-tracking, Fitbit securities were offered and traded at inflated prices."

---

[1] *McLellan v. Fitbit, Inc.*, No. 3:16-cv-00036-JD (N.D. Cal. Jan. 5, 2016).

AC ¶ 99. Further, plaintiffs allege that after the inaccuracy of Fitbit's heart rate tracking was revealed by the *McLellan* lawsuit, as well as by subsequent reporting and a study of the devices, Fitbit's stock suffered a "precipitous decline," losing 54.8 percent of its market value. *Id*. ¶¶ 80-81, 99. Plaintiffs argue that this caused them significant losses and damages. *Id*. ¶ 99.

Relevant to the current motion, plaintiffs bring claims under the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78 et seq., on behalf of a class of all persons who purchased or otherwise acquired Fitbit securities on the open market between June 18, 2015, and May 19, 2016.[2] *Id.* ¶ 3. Plaintiffs allege violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), against defendants Fitbit, Park, Zerella, and Friedman.[3] *Id*. ¶¶ 3, 38, 198-209. During the time period in question, defendant Park has served as Chief Executive Officer, Chairman, and President of Fitbit; defendant Zerella has served as Chief Financial Officer; and defendant Friedman has served as Chief Technology Officer. *Id*. ¶¶ 21-23. Plaintiffs allege that these defendants acted knowingly or were deliberately reckless in issuing materially false or misleading statements and/or in failing to disclose material facts concerning the inaccuracy of Fitbit's heart rate tracking devices. Plaintiffs also allege violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), against defendants Park, Zerella, and Friedman by virtue of their role as control persons of Fitbit. *Id*. ¶¶ 3, 210-215.

On October 26, 2016, the Court denied defendants' motions to dismiss the claims of Lead Plaintiff Fitbit Investor Group. Dkt. No. 122 ("Order"). On December 8, 2016, Fitbit defendants moved for leave to file a motion for partial reconsideration of the Court's Order pursuant to Civil Local Rule 7-9(b). Dkt. No. 137 ("Mot."). Plaintiffs opposed the motion. Dkt. No. 140 ("Oppo"). On December 21, 2016, the Court granted the motion.

Fitbit defendants now seek partial reconsideration, arguing that plaintiffs have failed to

---

[2] Plaintiffs also bring claims under the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77 et seq., on behalf of a class of all persons who purchased or otherwise acquired Fitbit A common stock pursuant and/or traceable to Fitbit's IPO on or about June 18, 2015. AC ¶¶ 2, 4. These claims are not at issue in the current motion.

[3] This Order refers to Fitbit, Park, Zerella, and Friedman collectively as "Fitbit defendants." References to "individual defendants" are to Park, Zerella, and Friedman collectively.

3

sufficiently allege the element of scienter as required in order to state a claim under Section 10(b) the Exchange Act. Fitbit defendants also seek partial reconsideration of the order denying the motion to dismiss plaintiffs' claims under Section 20(a) of the Exchange Act, arguing that because plaintiffs have failed to state a primary violation under Section 10(b), the Section 20(a) claims must likewise be dismissed.

## LEGAL STANDARD

The Court applies the legal standard under Federal Rules of Civil Procedure 9(b) and 12(b)(6), as well as under the Exchange Act and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), as recited in its October 26, 2016 Order. *See* Order at 5-7, 13.

A district court may revise an interlocutory order "at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b); *see also Amarel v. Connell*, 102 F.3d 1494, 1515 (9th Cir. 1996) ("the interlocutory orders and rulings made pre-trial by a district judge are subject to modification by the district judge at any time prior to final judgment") (quoting *In re United States*, 733 F.2d 10, 13 (2d Cir. 1984)). Nevertheless, "a court should generally leave a previous decision undisturbed absent a showing that it either represented clear error or would work a manifest injustice." *Abada v. Charles Schwab & Co., Inc.*, 127 F. Supp. 2d 1101, 1102-03 (S.D. Cal. 2000).

## DISCUSSION

Fitbit defendants raise a number of grounds why the Court should reconsider its prior Order and dismiss plaintiffs' Exchange Act claims for failure to allege scienter. The Court will address each of these in turn.

**I.    Scienter of the Individual Defendants**

At the outset, the Court notes that Fitbit defendants could have argued in their motion to dismiss that plaintiffs failed to allege scienter as to each of the individual defendants, yet Fitbit defendants did not do so. Nor have Fitbit defendants specifically briefed in their motion for

4

reconsideration or in their reply why plaintiffs' Amended Complaint fails as to Park, Zerella, and Friedman each individually.

Instead, Fitbit defendants now assert that the Ninth Circuit requires that "[s]cienter must be considered on a defendant-by-defendant basis . . . ." *See* Mot. at 3-4. Defendants overstate: The Ninth Circuit has not expressly held this, nor do the cases Fitbit defendants cite make any such requirement clear. *See, e.g., Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1063 (9th Cir. 2014) (finding that a witness statement lacks foundation where, among other reasons, "the witnesses lack first hand knowledge regarding what the individual defendants knew or did not know . . ."). Other of the cases, when read in full context, show that a plaintiff may, under certain circumstances, successfully plead scienter as to an individual executive defendant without allegations regarding that defendant's direct knowledge. For instance, the Ninth Circuit has explained that

> Where, as here, the Plaintiffs seek to hold individuals and a company liable on a securities fraud theory, we require that the Plaintiffs allege scienter with respect to each of the individual defendants. *See Glazer Capital Mgmt., LP v. Magistri,* 549 F.3d 736, 743-44 (9th Cir. 2008). We may, however, impute scienter to individual defendants in some situations, for example, where we find that "a company's public statements [are] so important and so dramatically false that they would create a strong inference that at least *some* corporate officials knew of the falsity upon publication." *Id.* at 744.

*Or. Pub. Emps. Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d 598, 607 (9th Cir. 2014).

Nevertheless, the Court has separately examined the allegations as to the individual defendants and reiterates its finding that plaintiffs' allegations raise a strong inference of scienter when viewed holistically, as prescribed by *Tellabs, Inc. v. Makor Issues and Rights, Inc*., 551 U.S. 308 (2007). In its prior Order, the Court found that "the allegations in this case are at least as cogent or compelling as a plausible alternative inference, namely that Fitbit executives were simply unaware of the high degree of inaccuracy in PurePulse devices alleged." Order at 18. The Court cited in particular to the contributions the devices made to Fitbit's revenue stream and the allegations by confidential witnesses ("CWs") 1 and 2. *Id.*

Fitbit defendants now argue that plaintiffs have failed to establish scienter as to the individual defendants under the core operations inference. Mot. at 5. After *Tellabs*, the Ninth

Circuit has explained that

> allegations regarding management's role in a company may be relevant and help to satisfy the PSLRA scienter requirement in three circumstances.  First, the allegations may be used in any form along with other allegations that, when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations." . . .  This view takes such allegations into account when evaluating all circumstances together.  Second, such allegations may independently satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information . . . .  Finally, such allegations may conceivably satisfy the PSLRA standard in a more bare form, without accompanying particularized allegations, in rare circumstances where the nature of the relevant fact is of such prominence that it would be "absurd" to suggest that management was without knowledge of the matter. . . .

*S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 785-86 (9th Cir. 2008) (internal citations omitted).

By their motion for reconsideration, Fitbit defendants appear to conflate the three circumstances that the Ninth Circuit has outlined, arguing that the Court could not have found scienter on a holistic review of the allegations because this case does not present the "exceedingly rare" circumstance in which it would be "absurd to suggest" the defendants were unaware of the falsity of the challenged statements.  *See* Mot. at 6.  This argument misconstrues the first circumstance that the Ninth Circuit identified in *South Ferry*, where a core operations inference will satisfy the scienter requirement if it is among allegations that "read as a whole" establish scienter.  *See S. Ferry*, 542 F.3d at 784.

This is the relevant circumstance here.  As the Court's prior Order explained, "a holistic review of the allegations [in the Amended Complaint] suffices to establish scienter."  Order at 18. The Amended Complaint alleges that Fitbit hired CW1 "specifically to develop quality-assurance analytics for Fitbit's Charge HR, Surge, and other wearable devices."  AC ¶ 164.  CW1 reported directly to Fitbit Chief Operations Officer Hansgregory C. Hartmann and presented Hartmann with monthly reports that "noted significant issues with the accuracy of Fitbit's heart-rate monitoring, relative to other types of failures."  *Id.* ¶¶ 165-166, 185.  Hartmann reported directly to Fitbit's CEO, defendant Park.  *Id.* ¶ 183.  CW2 was a contract fitness tester, hired "primarily to test the accuracy of Fitbit's heart-rate monitoring devices . . . ."  *Id.* ¶ 175.  CW2 "ultimately

reported" to COO Hartmann.[4]  *Id.* ¶ 177.  CW2 "found Fitbit's heart-rate monitoring devices to be highly inaccurate, particularly during vigorous exercise."  *Id.* ¶ 179.  According to CW1, defendant Park "frequently visited the Testing Area."  *Id.* ¶ 174.  Moreover, as alleged, the Surge and the Charge HR devices "provided Fitbit with 80% of its 2015 revenue."  *Id.* ¶ 152.

The Court restates that it finds these allegations, "when read together, raise an inference of scienter that is "cogent and compelling, thus strong in light of other explanations."  *See S. Ferry*, 542 F.3d at 785.  It is far more plausible that the CEO, CFO, and CTO of Fitbit knew of the outcomes of quality assurance testing, conducted "specifically" or "primarily" to assess the functioning of the heart rate monitoring products that accounted for 80% of Fitbit's revenue, than is the alternative inference, "namely that Fitbit executives were simply unaware of the high degree of inaccuracy in PurePulse devices alleged."  *See* Order at 18.

In addition, plaintiffs have a colorable argument that the third circumstance of the core operations theory may apply.  In *Berson v. Applied Signal Technology, Inc.*, 527 F.3d 982, 984 (9th Cir. 2008), the defendant company received 80% of its revenue from two federal government agencies.  Plaintiffs sued for violations of securities laws after the company counted four "stop-work" orders as backlogs (work contracted for but not yet performed), when in reality a stop-work order halted payment and often resulted in the work contract being cancelled altogether.  *Id.*  The Ninth Circuit found that plaintiffs had adequately pled scienter, even though they were only able to "*infer* that these high-level managers must have known about the orders because of their devastating effect on the corporation's revenue."  *Id.* at 987-88.  The Court finds there are analogies to be drawn between *Berson* and the facts alleged here, although the Court continues to rest its decision on the finding that plaintiffs have alleged scienter of the individual defendants when viewed through a holistic lens.[5]

---

[4] Fitbit defendants are correct that the Court previously misstated these relationships in saying that "both CW 1 and CW 2 reported directly to COO Hartmann."  *See* Order at 17.  This does not, however, alter the Court's ultimate conclusion.

[5] Fitbit defendants further argue that plaintiffs must include allegations regarding adverse business impact, and that because there are no such allegations in the Amended Complaint, then plaintiffs' theory fails.  Dkt. No. 146 ("Reply") at 5-6.  However, nothing in the *Berson* decision creates such a rule, and Fitbit defendants fail to cite authority for this position.

Fitbit defendants also argue there can be no scienter as to the individual defendants due to weaknesses regarding plaintiffs' confidential witness statements. Mot. at 5-6. Relying primarily on the Ninth Circuit's decision in *Intuitive Surgical*, Fitbit defendants argue that the confidential witness statements cannot be indicative of scienter because the CWs lacked direct access to the individual defendants and do not link specific reports to those defendants. *Id.* at 5.

The Court finds *Intuitive Surgical* distinguishable from the facts alleged here. That case involved broad allegations regarding the company's financial health that the court could not even pinpoint as false. *See Intuitive Surgical*, 759 F.3d at 1055, 1058. As proof of scienter, the plaintiffs there "point[ed] to the impressions of witnesses who lacked direct access to the executives but claim that the executives were involved with Intuitive's day-to-day operations and were familiar with the contents of . . . software-generated reports" that "contain[ed] undisclosed sales data . . . ." *Id.* at 1062-63. The Ninth Circuit rejected this theory of scienter, finding that there were no allegations linking the reports (or the witnesses) to the executives, and that "[m]ere access to reports containing undisclosed sales data is insufficient . . . ." *Id.* at 1063.

The allegations here, however, are more concrete. Rather than relying on allegations of broad misstatements regarding a company's finances, and pointing to "reports containing undisclosed sales data," plaintiffs here have alleged specific misstatements regarding PurePulse's monitoring accuracy, and rely on confidential witnesses who were hired for the purpose of testing such accuracy and who reported their findings up the chain within the company. Plaintiffs' allegations go beyond merely claiming that executives were involved in day-to-day operations and were therefore familiar with automated reports about the company's financial health. CW1 personally generated the reports documenting failures with the devices and presented the reports to COO Hartmann. AC ¶¶ 166-167. Although it is not clear from the Amended Complaint in what format CW2 presented his/her findings, CW2 managed the logging of fitness testers' heart rate results. *Id.* ¶ 177. The Amended Complaint states that "CW1 and CW2 both provided Hartman[n] with information about the inaccuracy of Fitbit's heart-rate monitoring devices." *Id.* ¶ 185. Thus, the witnesses here have personal knowledge about the contents of the reports that was lacking in *Intuitive Surgical*.

Although Fitbit defendants are correct that the Amended Complaint does not contain express allegations that COO Hartmann gave this information to defendants Park, Zerella, and Friedman, the Court does not find this fatal to plaintiffs' Exchange Act claims.[6] Although the Ninth Circuit has found that "allegations may *independently* satisfy the PSLRA where they are particular and suggest that defendants had actual access to the disputed information," this is but one of the three circumstances that may support a scienter finding under a core operations theory. *See S. Ferry*, 542 F.3d at 785-86 (emphasis added). As explained above, the Court rests its finding on a holistic evaluation of the allegations. That plaintiffs' allegations do not directly connect the dots between Hartmann's knowledge and the individual defendants will not be grounds for dismissing the complaint. The Court finds it to be a "cogent and compelling" argument that information regarding the basic functioning of products that constituted 80% of Fitbit's revenue stream, if given to Hartmann as alleged, would also have been known to the individual defendants. *See Tellabs*, 551 U.S. at 324.

## II. Corporate Scienter as to Fitbit

Fitbit defendants also argue there is no scienter as to defendant Fitbit Inc. They argue the Court's prior Order finding scienter as to Fitbit "is exactly the sort of collective scienter theory rejected by the Ninth Circuit in *Glazer*." Mot. at 8. Plaintiffs note that Fitbit defendants do not dispute that if plaintiffs have adequately alleged scienter as to the individual defendants then scienter may properly be imputed to the company. Oppo. at 18. In their reply, Fitbit defendants do not challenge this statement but focus on their argument that plaintiffs have failed to establish the individual defendants' scienter. *See* Reply at 8.

The Ninth Circuit has not rejected the theory of collective scienter outright but has left open the possibility that it may apply in certain situations. *See Glazer*, 549 F.3d at 744 ("there

---

[6] Allegations tracing the knowledge of Hartmann to the individual defendants include that Hartmann reported directly to defendant Park; that "CW1 believes Hartmann provided CW1's findings and recommendations to members of the Company's executive team, including Park;" and that "[u]pon information and belief, Defendants Park, Zerella, and Friedman were aware of CW1's findings and recommendations when making public statements to investors." AC ¶¶ 183, 186-187.

9

1    could be circumstances in which a company's public statements were so important and so
2    dramatically false that they would create a strong inference that at least *some* corporate officials
3    knew of the falsity upon publication") (citing *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513
4    F.3d 702, 710 (7th Cir. 2008)), 745 (noting that the issue of collective scienter "is not before us").
5    *Glazer* involved a company that made and sold explosive detection systems. *Id.* at 739. Prior to
6    the finalization of a merger with General Electric, potential violations of the Foreign Corrupt
7    Practices Act of 1977 became public. *Id.* The Ninth Circuit examined whether the plaintiffs
8    needed to plead scienter as to the defendant CEO, who signed the merger agreement containing
9    the alleged false statements, or whether they could "hold the company as a whole responsible"
10   under a collective scienter theory. *Id.* at 743. Noting that the plaintiffs' securities claim rested on
11   three statements contained in the sixty-page merger agreement, the court found that, "given the
12   limited nature and unique context of the alleged misstatements in this case, we hold that the
13   PSLRA requires Glazer to plead scienter with respect to those individuals who actually made the
14   false statements in the merger agreement." *Id.* at 745. Significantly, the plaintiffs "pled no facts
15   that directly demonstrate [the CEO] possessed the requisite scienter when he made the
16   representations contained in the merger agreement." *Id.* Given that "the surreptitious nature of
17   the transactions creates an equally strong inference that the [illegal] payments would have
18   deliberately been kept secret" there was no strong inference of scienter in that case. *Id.* at 746-47.

19   Here, there is nothing inherently surreptitious about the nature of the underlying alleged
20   violations; that is, there is no equally strong inference that the shortcomings of a new
21   technological feature of a company's product would deliberately have been kept secret from the
22   company's CEO, CFO, and CTO. This is particularly so where employees were hired specifically
23   to test the accuracy of this feature. *See* AC ¶¶ 164, 175. More importantly, unlike in *Glazer*,
24   plaintiffs here have sufficiently pled scienter as to the individual executive defendants. *See* § I,
25   *supra*. The Ninth Circuit made clear in *Glazer* that if the plaintiffs had properly pled individual
26   scienter with respect to the CEO, who "was responsible for actually making the statements in the
27   merger agreement," then a finding of scienter as to the company would have been appropriate.
28   *See Glazer*, 549 F.3d at 745. Given that the Court has found scienter as to the individual

10

defendants in this case, scienter may properly be imputed to the company as well.

### III. Fitbit's IPO and Scienter

Fitbit defendants further ask the Court to reconsider its Order "accept[ing] Plaintiffs' argument that 'in preparation for its IPO, Fitbit's management had an incentive to inflate the company's prospects . . . .'" Mot. at 7. Previously, the Court found plaintiffs' allegations regarding the upcoming IPO and the fact that "the Charge HR and Surge were key revenue drivers for the company" would indeed "provide a powerful incentive." Order at 14. The use of the qualifier "powerful" may have been an overstatement, but the Court finds no legal error in stating that these allegations "may be relevant to a holistic inquiry into scienter." *See id.*

In any event, this is of no consequence because the Court previously made clear that its decision did not rest on a finding that an IPO might provide an incentive to inflate a company's prospects. *See* Order at 14. The Court noted that "mere motive and opportunity" does not suffice to demonstrate scienter under the PSLRA, and the Court did not focus on these allegations of the Amended Complaint in viewing plaintiffs' claims holistically. *See id.* at 14, 17-18. Because the Court's Order did not turn on these allegations, there is nothing for the Court to reconsider here.

### IV. Non-Defendant Hartmann and Negative Internal Reports

Finally, Fitbit defendants urge that there is no scienter because the "Amended Complaint fails to describe the contents of any negative internal reports, as required under Ninth Circuit law." Mot. at 9. They argue that the failure to describe the reports means that there can be no scienter as to Hartmann and therefore there can be no scienter as to the individual defendants.

As described above, *Intuitive Surgical*, on which defendants rely, involved software generated reports "containing undisclosed sales data." *See* 759 F.3d at 1056, 1063. The plaintiffs there alleged that the software that created the reports "was 'accessible on-line and thus available at all times' to the individual defendants" and "that the individual defendants knew or should have known that system placement was decreasing and that this decreased growth was evident from the software-generated reports to which the executives had access." *Id.* at 1056-57. Likewise, in

*Lipton v. Pathogenesis Corporation*, 284 F.3d 1027, 1036 (9th Cir. 2002), the court found a lack of scienter where plaintiffs merely asserted in conclusory terms that the defendants had access to internal data demonstrating a decline in sales . . . ." The allegations failed where "plaintiffs refer to the existence of the [relevant] data and make a general assertion about what they think the data shows, [but] plaintiffs do not allege with particularity any specific information showing that [the] data informed defendants that patient demand for [defendant's product] was flat." *Id.*

*Intuitive Surgical* and *Lipton* differ in critical respects from the situation at hand here, where CW1 states that he created the reports, that "his monthly reports noted significant issues with the accuracy of Fitbit's heart-rate monitoring, relative to other types of failures," and that he personally presented those reports to COO Hartmann. *See* AC ¶¶ 166-167. Given these allegations, the Court simply cannot credit Fitbit defendants' argument that plaintiffs have failed to allege scienter as to Hartmann.

As Judge Davila of this district has noted, "The Ninth Circuit does not appear to require the contents of the report to be alleged, but rather provides that as an example to demonstrate how a witness statement can be corroborated." *In re Intuitive Surgical Sec. Litig.*, No. 13-cv-1920-EJD, 2014 WL 7146215, at *5 (N.D. Cal. Dec. 15, 2014). Even if this were not so, the Court finds that plaintiffs' allegations sufficiently detail the contents of the negative reports at this stage. The specificity that Fitbit defendants seek, such as the frequency of alleged failures and the precise level of inaccuracy, crosses into territory better evaluated on a motion for summary judgment. *See* Mot. at 9; Reply at 10.

Having reviewed the papers filed and the authority cited therein, the Court concludes that many of the cases that Fitbit defendants cite are not "dispositive Ninth Circuit authority" as defendants contend, but are distinguishable from the case at hand in critical ways. Overall, the Court agrees with plaintiffs that Fitbit defendants "confuse the question of whether an allegation is *independently sufficient* to establish scienter with the question of whether it is *relevant* as part of a holistic scienter analysis." *See* Oppo. at 10. The motion for reconsideration does not meaningfully address the holistic review on which the Court's prior Order and this Order rest. The Court remains mindful that, "[i]n assessing the allegations holistically as required by *Tellabs*,

the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *S. Ferry*, 542 F.3d at 784.

Whether in fact the Fitbit devices failed to measure users' heart rates accurately, and whether in fact Fitbit defendants knew of such failure, are questions to be determined another day. For now, plaintiffs have sufficiently alleged the necessary elements to proceed on their claims under the Exchange Act.[7]

## CONCLUSION

For good cause shown, the Court DENIES Fitbit defendants' motion for reconsideration of the October 26, 2016 Order denying defendants' motions to dismiss.

**IT IS SO ORDERED**.

Dated: January 19, 2017

_____
SUSAN ILLSTON
United States District Judge

---

[7] Given that the Court denies the motion to reconsider plaintiffs' claim under Section 10(b) of the Exchange Act, the Court will also allow plaintiffs' Section 20(a) claim to proceed.